**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES,

*ex rel.* ALAN DOWLESS



*ex rel.* BARBARA EVANS



*ex rel.* CARRIE WHALEN



STATE OF CALIFORNIA,
STATE OF FLORIDA,
STATE OF HAWAII,
STATE OF ILLINOIS,
STATE OF IOWA,
COMMONWEALTH OF MASSACHUSETTS,
STATE OF MINNESOTA,
STATE OF NEW JERSEY,
STATE OF NEW YORK,
STATE OF TENNESSEE,
COMMONWEALTH OF VIRGINIA,
CITY OF CHICAGO,
CITY OF NEW YORK CITY


   Plaintiffs,

V.

ADOBE SYSTEMS INCORPORATED
354 Park Avenue
San Jose, CA 95110-2704

   *Serve: Resident Agent*
   Karen Robinson
   345 Park Avenue
   San Jose, CA 95110

   and

**CIVIL ACTION NO.**
**1:17-CV-02039**
**FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

1

CARAHSOFT TECHNOLOGY
CORPORATION
1860 Michael Faraday, Dr. Suite 100
Reston, VA 20190

     *Serve: Resident Agent*
     Curtis P. Abod
     18524 Office Park Drive
     Gaithersburg, MD 20886

     and

EMERGENT, LLC
6219 Leesburg Pike Suite 300
Vienna, VA 22182

     *Serve: Resident Agent*
     Corporation Service Company
     Bank of America Center
     1111 East Main Street, 16th Floor
     Richmond, VA 23219

     and

CDW/CDW-G CORPORATION
200 N. Milwaukee Ave.
Vernon Hills, IL 60061

     *Serve: Resident Agent*
     Illinois Corporation Service C
     801 Adlai Stevenson Drive
     Springfield, IL 62703

     Defendants.

## <u>AMENDED COMPLAINT</u>

1.     This is a civil action by Plaintiff-Relators ALAN DOWLESS ("Relator

Dowless"), BARBARA EVANS ("Relator Evans"), and CARRIE WHALEN ("Relator

Whalen") who, by and through undersigned counsel, file this Amended Complaint on behalf of

themselves, the United States, and the states of California, Florida, Hawaii, Illinois, Iowa, Massachusetts, Michigan, Minnesota, New Jersey, New York, Tennessee, and Virginia, and the cities of Chicago and New York City, against Defendants ADOBE SYSTEMS INCORPORATED ("Adobe"), CARAHSOFT TECHNOLOGY CORPORATION ("Carahsoft"), EMERGENT, LLC ("Emergent"), and CDW-G CORPORATION ("CDW-G") for Defendants' collective violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986), the Federal Anti-Kickback Act. 42 U.S.C. § 51 *et seq.*, and state and local false claims statutes.

2.      This is an action to recover damages and civil penalties on behalf of the United States arising out of Defendants' fraudulent scheme and conspiracy to create and submit, and to cause the creation and submission of false and/or fraudulent records, statements, and claims, and to fail to repay amounts owed to the United States, all in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

3.      Defendants effectuate their fraudulent scheme and conspiracy in the following ways: 1) Adobe rewards its partners, including Carahsoft, Emergent and CDW-G, with illegal kickbacks to influence the sale of Adobe products to government customers, triggering violation of the Anti-Kickback Act ("AKA")[1]; 2) Adobe causes Carahsoft to improperly bill the government for annual term fees on personal licenses, for which the government agency has no obligation to pay; 3) Adobe, conspiring with Carahsoft and CDW-G, fraudulently induces the government to purchase unnecessary software licenses; and 4) Adobe, conspiring with Carahsoft, creates software bundles in order to sell unnecessary software licenses and retains improper

---

[1] Defendants' violations of the AKA give rise to liability under the FCA, *infra* at 17.

payment for applications that a government end-user neither requests nor knows of its existence, all conducted in conspiracy with and amongst the Defendants and other co-conspirators.

4.     Adobe's fraudulent conduct began with its plan and intent to use its Solution Partner Program to tender kickbacks to its business and premier level partners ("partners" herein) in order to induce the purchase of Adobe software to prospective government customers. In other words, partners working with an Adobe sales representative on a particular deal registration identify and close business opportunities with the government in order to receive kickbacks from Adobe. Partners recommend Adobe software ahead of other technically acceptable, and in some instances more suitable software solutions that are offered by competing software companies. Upon close of the deal, Adobe offers illegal remuneration up to $150,000.00 per deal, as an improper reward for the sale of Adobe products to the government. Through the kickback program, Adobe incentives a significant cohort of government contractors, including Defendants, to promote Adobe products. In addition to monetary kickbacks, Adobe also offers its partners exclusive invitations to sporting events, golf tournaments, and expensive dinners.

5.     Under the kickback scheme, Adobe *causes* the creation and submission of false and/or fraudulent records, statements, and claims to the government, fraudulently inducing the government to purchase Adobe products, that otherwise would not have been purchased, had the government known that Adobe was fraudulently conspiring with its partners to sell its products. Some partners, including Emergent and CDW-G, are also re-sellers. Such re-sellers also have the direct advantage of purchasing from Adobe at a discounted rate and billing the government customer at a higher rate. As a result of Adobe's conspiracy with a re-seller like Emergent, not only did Emergent receive one of the highest pay-outs under the kickback scheme during fiscal years 2015 and 2016, but Adobe and Emergent gained transactional profit from the initial

procurement itself, otherwise known as front-end margin. Similarly, Adobe and CDW-G also gained profit from both front-end margin and back-end kickback payments.

6.      Other aspects of the fraud arise exclusively from Adobe's GSA Schedule holder, Carahsoft. Adobe perpetrates various fraudulent schemes related to obtaining inflated annual term fees for personal licenses, inducing the government to make repeated purchases of unrequired and unnecessary software licenses, and further inducing the government to purchase unnecessary software applications in software bundles, all in order to grossly inflate government payments. By falsely and fraudulently representing the quantity and type of Adobe software solutions that the government needs and should actually be paying for, Adobe *causes* Carahsoft (and CDW-G where applicable) to improperly bill the government for Adobe products, knowingly and intentionally overcharging the government.

7.      Adobe's financial motive and intent is clear in each of the aforementioned fraudulent practices. Adobe facilitates and oversees the entire fraud, conspiring with partners like Emergent and CDW-G, who are also re-sellers that fully understand the government procurement process and how they could benefit from working with Adobe under the illegal kickback scheme. Adobe also engages in conspiracy with Carahsoft and CDW-G to *cause* the companies to wrongfully bill the government for higher fees, licenses, and other unnecessary procurement transactions.

8.      Adobe commits fraud with one goal - to improperly increase the sale of its software solutions from prospective government customers, while wrongfully generating revenue from current government customers.

9.      As a result, Adobe, Carahsoft, Emergent, and CDW-G obtain and retain government funds they are not entitled to receive, for which they were never eligible, and for

which they fraudulently refuse to provide software solutions that the government paid them to provide, or in some cases, did not need them to provide at all.

10.     In summary, this *qui tam* case is brought against Defendants for:

(a)  Adobe's conspiracy with Carahsoft and other partners, including Emergent and CDW-G, to facilitate and contribute to the kickback scheme, while intentionally concealing the fraud in order to fraudulently induce the government to purchase Adobe products and services and thus, *causing* the creation and submission of false and/or fraudulent records, statements, and claims to the government;

(b)  Adobe's schemes to grossly inflate government payments for claims, engaging in conspiracy with Carahsoft and CDW-G to cause the companies to submit false claims, records, and statements to the government for a surplus of payments; and

(c)  All Defendants' failure to self-report and return payments fraudulently obtained from the government due to Defendants' fraudulent scheme.

11.     Simply put, if the government had known the nature and extent of Adobe's intention to conspire with Carahsoft, Emergent, and CDW-G in order to perpetrate fraudulent schemes and improper sales configurations to its government customers, no payments would have been made for software solutions produced by Adobe.

## JURISDICTION AND VENUE

12.     This is an action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331. This case arises from the wrongful conduct of the Defendants incident to obtaining funds from the government.

13.   This Court has personal jurisdiction over the Defendants under 31 U.S.C. § 3730(a), which authorizes nationwide service of process and because the Defendants have at least minimum contacts with the United States.

14.   31 U.S.C. § 3732(a) provides: "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in any proscribed by section 3729 occurred." (b) Venue is proper in this District because Defendants Adobe, Carahsoft, Emergent, and CDW-G maintain and operate these companies within this District.

15.   Relators pre-disclosed the core facts and claims to the United States Attorney's Office for the District of Columbia on July 31, 2017. Suit was filed on October 3, 2017. In addition, as required under the False Claims Act, on October 30, 2017, Relators provided to the United States Attorney for the District of Columbia a disclosure statement of all material evidence and information related to the original complaint.

16.   The government would not have known about this fraud, its details, and its breadth and scope, without the personal knowledge provided by the Relators.

## PARTIES AND ENTITIES

17.   Relator Alan Dowless is a resident of Pennsylvania. Relator was Senior Partner Sales Manager at Adobe, based in Mclean, Virginia starting June 1, 2015. Adobe hired Relator for his veteran expertise in managing deal registrations for government procurement.

18.   Relator's duties and responsibilities mainly involved working with all public sector partners (community level, business level, and premier level) to identify and close deal registrations, particularly with the Department of Defense ("DoD") and the Intelligence Community agencies. Adobe instructed Relator to track every deal each partner identified,

influenced, and closed, in order to ensure that Adobe's kickback scheme was constantly operating. In other words, a substantial part of Relator's role was to manage public sector partnerships, to include tracking, auditing, and facilitating kickbacks to partners, on behalf of Adobe, in exchange for the partners' active influence and participation in generating federal spending.

19.     Relator also managed the recruitment of new partners seeking entry into Adobe's Solution Partner Program, many of which were already aware of Adobe's culture of corruption – including the infamous kickback scheme.

20.     In addition, Relator and his colleagues in sales manager positions for other account sectors, worked together to develop and implement strategic business plans to achieve and exceed revenue targets for Adobe software solutions. Specifically, sales managers working for Adobe facilitated the kickback scheme to meet sales goals for Adobe through government clients. Thus, Relator not only fully understands Adobe's sales practices but he personally observed the kickback scheme and had daily interactions and exposure with how Adobe conspired with partners such as Emergent and CDW-G to unduly influence the sale of Adobe software solutions to government customers.

21.     For years, since the beginning of Relator's employment, Relator did not see any efforts to correct and overhaul the kickback scheme that was integral to the Solution Partner Program. Relator was terminated from his position on or about February 3, 2017 and has since left Adobe.

22.     Relator Barbara Evans is a resident of Virginia. Adobe hired Relator in or about January 2013. Since then, Relator served in various positions, including Account Manager,

Enterprise Sales Manager, and the DoD Manager, providing veteran expertise in managing deal registrations for government procurement.

23.     Relator holds an impressive track record for managing and closing the largest software solutions deal Adobe ever had with the government – having successfully closed a deal ultimately worth $42,000,000.00 with the DoD.

24.     Having worked in various positions at Adobe, Relator was at the center of Adobe's daily operations with regard to its sales practices and deal registrations with government customers. By virtue of her daily interactions with Adobe, which included everyone from high level executives to fellow sales managers and affiliated employees at Adobe, she was directly exposed to how Adobe conspired with Carahsoft and CDW-G to increase the sale of Adobe software solutions to prospective government customers and continue to generate revenue from its current government customers.

25.     Accordingly, Relator provides personal knowledge of the fraud related to obtaining inflated annual term fees for personal licenses, inducing the government to make repeated purchases of unnecessary software licenses, and further inducing the government to purchase unrequired software applications in software bundles.

26.     For years, since the beginning of Relator's employment, Relator did not see any efforts to correct and overhaul the false and fraudulent billing practices that Adobe was engaged in, using Carahsoft's ability to facilitate billing as the GSA Schedule holder for a majority of Adobe products. Relator was terminated from her position on or about December 7, 2016 and has since left Adobe.

27.     Relator Carrie Whalen is a resident of Georgia. Relator was the Sales Manager and Sales Representative at Adobe in its Government Sales Division. Joining Adobe in or about

January 2015, Relator also has veteran expertise in managing deal registrations for government procurement, like her co-relators.

28.     Specifically, Relator has personal knowledge of substantial evidence and information, including internal communications, concerning the fraud related to obtaining annual term fees for personal licenses, inducing the government to make repeated purchases of unnecessary software licenses, and the routine selling of software bundles.

29.     For example, Relator provides several significant examples related to Adobe's wrongful use of  Enterprise Term License Agreements ("ETLAs"), which is a customized three-year agreement for both government and commercial organizations, that is supposed to assist a government organization with purchasing and deploying Adobe software in an efficient, targeted, and cost-effective manner.

30.     For years, since the beginning of Relator's employment, Relator did not see any efforts to correct and overhaul the false and fraudulent billing practices that Adobe was engaged in, using Carahsoft's ability to facilitate billings as the GSA Schedule Holder for a majority of Adobe products. Relator resigned from her position in or about October 2016.

31.     Defendant Adobe is the well-known software development company registered in California. Founded in 1982, Shantanu Narayen is its CEO and President. Since then, Adobe has grown into one of the nation's largest companies, best known for its flagship product Acrobat. Adobe is a Delaware corporation with its principal place of business at 345 Park Avenue San Jose, California 95110. Adobe operates 22 offices across the U.S. and further manages 15,000 employees worldwide. As part of its multi-billion dollar business operation, Adobe profits hundreds of millions of dollars from government customers annually. In fiscal year 2016, when

Relators were still employed with the company, Adobe achieved record annual revenue of $5.85 billion. More recently, Adobe achieved revenue of $7.30 billion in fiscal year 2017.

32.     Among a vast portfolio of software products, Adobe Experience Manager ("AEM") forms are one of Adobe's software solutions for federal, state, and local governments. AEM forms provides a solution to create, manage, publish, and update complex digital forms while integrating with back-end processes, business rules, and data. The Adobe Experience Cloud ("AEC"), formerly Adobe Marketing Cloud ("AMC") is a collection of integrated online marketing and Web analytics products by Adobe, which includes eight software applications, including the AEM forms. Adobe sells its products in a variety of combinations, including as standalone products or as combined software bundles often referred to as "Clouds."

33.     In addition to AMC products and services, Adobe also offers Adobe Creative Cloud, a collection of applications and services that gives subscribers access to a collection of software used for graphic design, video editing, web development, and photography. Previously, Adobe offered individual products as well as software suites containing several products including the Adobe Creative Suite. Adobe first announced the Creative Cloud in October 2011.

34.     Defendant Carahsoft[2] is a privately held IT solutions provider registered in Maryland. Founded in 2004, Craig P. Abod is its CEO and President. Carahsoft operates as a government solutions provider with a principal place of business at 1860 Michael Faraday Dr. Reston, Virginia 20190. Since its inception, Carahsoft has provided IT solutions and support to over 3,000 prime contractors, system integrators, value-added resellers, and other channel

---

[2] In 2010, a lawsuit was filed against Carahsoft and VMWare, a subsidiary of Dell Technologies that provides cloud computing and platform virtualization software and services, for allegedly overcharging government customers. Both Carahsoft and VMWare denied wrongdoing but agreed to settle the case with the U.S. Department of Justice for $75.5 million.

partners. In fiscal year 2017, Carahsoft booked over $4 billion in sales and expanded its team to 900 sales, marketing, customer service, and contracting professionals.

35.     Notably, Carahsoft is the master GSA Schedule holder for Adobe products and services. In practice, Carahsoft is the transactional hub for the vast majority of Adobe's government business. In its role as the Adobe distributor, Carahsoft addresses the government market in a variety of ways. First, it uses its "Letter of Supply" from Adobe to position Adobe products and services on its GSA Schedule. Through its schedule, it may directly sell to and bill the government for the sale of Adobe products and services. Second, Carahsoft also permits an Adobe partner to use Carahsoft's GSA Schedule as an agent of Carahsoft. Third, Carahsoft also "teams" with another Adobe partner who holds a GSA Schedule. In practice, the two entities effectively approach the government as one with its contracts "teamed together" for the purpose of a specific procurement transaction.

36.     In all of these cases, it is Carahsoft's GSA Schedule and privity of contract with the government, that facilitates the ability of all Adobe partners to cause to submit false claims for payment, either on Carahsoft paper or as an agent or teammate of Carahsoft.

37.     In short, Carahsoft's ability to facilitate Adobe partners' access to its GSA contracting vehicle is at the heart of this fraud. At all times relevant, Adobe conspires with Carahsoft to cause Carahsoft and other partners to improperly bill the government for Adobe products.

38.     Defendant Emergent (also known as the Mythics Emergent Group, Inc.) is a value-added reseller and an open source systems integrator registered in Virginia. Its principal place of business is at 8219 Leesburg Pike, Vienna, Virginia 22182. Established in 2006, Greg Christensen is its President. Emergent is focused on solving business and mission challenges that

include IT solutions and consulting services on behalf of federal, state, and local government agencies.

39.     As applied to the facts alleged in this case, Emergent is one of Adobe's business-level partners. As a result of the conspiracy between Emergent and Adobe to influence various government agencies with the procurement of Adobe software solutions, Emergent received one of the highest pay-outs under the kickback scheme.

40.     Emergent is also a re-seller. Accordingly, at the time Relators were employed at Adobe, Emergent was also capable of selling Adobe products directly to government end-users, such as the Environmental Protection Agency, the Department of Homeland Security, the Department of Commerce, and the United States Navy, either using its own GSA Schedule, or by acting as an agent to or teaming with Carahsoft's GSA Schedule.

41.     Defendant CDW-G[3] is a leading multi-brand technology solutions provider to both commercial and government organizations. A Fortune 500 company registered in Illinois, CDW-G was founded in 1984 and its principal place of business is at 7200 N. Milwaukee Ave. Vernon Hills, IL 60061. Thomas E. Richards is its CEO. Employing more than 8,900 coworkers, CDW-G operates 26 locations across the U.S. In fiscal year 2017, CDW-G reported annual net sales of $15.2 billion.

42.     As applied to the facts alleged in this case, CDW-G, like Emergent, is one of Adobe's business level partners. As a result of the conspiracy between CDW-G and Adobe to influence various government agencies with the procurement of Adobe software solutions, CDW-G received pay-outs under the kickback scheme.

---

[3] CDW-G of CDW operates as a subsidiary of CDW and signifies its government sales division.

43.     In addition to its business level partnership with Adobe, CDW-G is also a re-seller. Accordingly, at the time Relators were employed at Adobe, CDW-G was also capable of selling Adobe products directly to government end-users, either using its own GSA Schedule, or by acting as an agent to or teaming with Carahsoft's GSA Schedule.

44.     At all times relevant, Adobe engaged in conspiracy with Carahsoft, Emergent, and CDW-G to commit the various forms of fraud alleged in this Amended Complaint. At all times relevant, each Defendant was the authorized agent of each other Defendant.

## **LEGAL BACKGROUND**

### A. *False Claims Act ("FCA")*

45.     The FCA provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or Fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a False record or statement material to a false or fraudulent claim;

(a)(1)(C) conspires to defraud the Government by getting a false or Fraudulent claim allowed or paid; or
…
(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

…

is liable to the United States for any civil penalty, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 not; Public Law 104-401), [which is currently not less than $10,957 and not more than $21,916] plus 3 times the amount

14

of damages which the Government sustains because of the act of
that person. 31 U.S.C. § 3729.

46.     For purposes of the False Claims Act, the terms "knowing" and "knowingly"
mean that a person, with respect to information: (i) has actual knowledge of the information; (ii)
acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless
disregard of the truth or falsity of the information; and (B) require no proof of specific intent to
defraud. 31 U.S.C. § 3729(b).

47.     The FCA defines a "claim" to include any request or demand, whether under a
contract or otherwise, for money or property which is made to a contractor, grantee, or other
recipient if the United States Government provides any portion of the money or property which
is requested or demanded, or if the Government will reimburse such contractor, grantee, or other
recipient for any portion of the money or property which is requested. 31 U.S.C. §
3729(b)(2)(A)(i)-(ii).

48.     The term "material" means having a natural tendency to influence, or be capable
of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

49.     The FCA contains an independent requirement to correct errors that will cause, or
have caused, a government overpayment. The Act attaches liability to anyone who knowingly
makes, uses, or causes to be made or used, a false statement or record material to an obligation to
pay or transmit money to the government, or who knowingly conceals or knowingly and
improperly avoids or decreases an obligation to pay or transmit money to the government. 31
U.S.C. § 3729(a)(1)(G).

50.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28
U.S.C. 2461 note; Public Law 104-410), the FCA civil penalties were adjusted to not less than
$10,957 and not more than $21,916.

15

### B. *Anti-Kickback Act ("AKA")*

51.     Prosecutions under the Anti-Kickback Act of 1986, 41 U.S.C § 51 *et seq.*, must

establish the following:

> (1) Prohibited conduct -- the Act prohibits attempted as well as completed "kickbacks," which include any money, fees, commission, credit, gift, gratuity, thing of value, or compensation of any knowing. The act also provides that the inclusion of kickback amounts in contract prices is prohibited conduct in itself.

> (2) Purpose of kickback -- requires that the purpose of the kickback was for improperly obtaining or rewarding favorable treatment. It is intended to embrace the full range of government contracting. Prior to 1986, the "kickback" was required to be for the inducement or acknowledgement of a subcontract.

> (3) Covered class of "kickback" recipients – The Act prohibits "kickbacks" to prime contractors, prime contractor employees, subcontractors, and subcontractor employees. These terms are defined in the Act.

> (4) Type of contract – The Act defines kickbacks to include payments under any government contract. Prior to this legislation, the statutes' applicability was limited to negotiated contracts.

> (5) Knowledge and willfulness – The Act requires one to knowingly and willfully engage in the prohibited conduct for the imposition of criminal sanctions.

41 U.S.C § 51 *et seq.* In sum, the AKA prohibits entities involved in government contracting and

procurement from offering, accepting, or attempting to accept inducements for favorable

treatment in awarding contracting for products and services to prospective government

customers. *See* FAR 3.502-2: Subcontractor Kickbacks.

16

52.     By virtue of the AKA violation, such entities are also liable under the FCA. The fact that a claim results from a kickback may render it false or fraudulent, creating liability under the FCA.

53.     To recover under the AKA, relator must establish two elements: (1) prove that a payment was made by a subcontractor to an employee or agent of a prime contractor with the United States, or of a higher tier subcontractor under such a prime contract; and (2) prove that such payments were made as an inducement for the award of a subcontract or order from the prime contractor of any subcontractor, or as an acknowledgement of a subcontract previously awarded. *See Alsco-Harvard Fraud Litigation*, 523 F. Supp. 790, 807 (1981).

54.     As alleged *infra* at 16-63, Adobe paid kickbacks to its partners in order to gain favorable treatment in procurement transactions with Adobe products, all of which were facilitated under Carahsoft's GSA Schedule contract with the government. In other words, in paying kickbacks to its partners, Adobe increased its own revenue by leveraging Carahsoft's GSA Schedule contract.

55.     Of note, some partners were also resellers of Adobe products and services, which includes named Defendants Emergent and CDW-G. Nonetheless, Carahsoft's GSA Schedule anchored virtually all of Adobe's government business, even for transactions directly involving Emergent and CDW-G.

## C.   *The General Services Administration ("GSA")*

56.     The General Services Administration is a procurement and property management agency designed to assist federal agencies with procurement of supplies and services and to provide government customers with the "best value" for the products. *See* General Services Administration: Multiple Award Schedules Desk Reference (Fall 2016).

57.     Federal agencies are eligible to use GSA sources pursuant to the Federal Property and Administrative Services Act of 1949. *See* General Services Administration: Multiple Award Schedules Desk Reference (Spring 2017).

58.     Specifically, the GSA Schedule permits the acquisition of goods and services using previously negotiated contracts to obtain desired items at volume pricing. *Id*. The GSA Schedule is generally comprised of companies that supply comparable commercial products and services through contracts. *Id*. Most contracts are awarded to responsible companies that offer commercial supplies or services at fair and reasonable prices. *Id*.

59.     Government agencies obtain considerable latitude in structuring its procurement process and evaluating factors, including price, past performance, technical capabilities, and qualifications of contracting entities, in awarding Schedule contracts. *Id*.

60.     When determining the "best value" of a potential provider, the government agency is permitted to take advantage of "best value" techniques as defined in FAR 2.101. *See* FAR 2.101 ("'Best value' means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement.").

### D.   *The General Services Administration IT Schedule 70 ("GSA IT Schedule 70")*

61.     The GSA IT Schedule 70 is the government's primary go-to source for IT acquisitions and solutions, including hardware, software, maintenance, network services, cybersecurity, and professional IT services.

62.     By maintaining the IT Schedule 70, the government ensures consistent delivery of tools and expertise needed to shorten procurement cycles, ensure compliance, and obtain the "best value" for technology products, services, and solutions for federal, state, and local

government agencies. *See* "IT Schedule 70" on the GSA website available at

https://www.gsa.gov/technology/technology-purchasing-programs/it-schedule-70.

63.     Specifically, the IT Schedule 70 is an Indefinite Delivery/Indefinite Quantity

Multiple Award Schedule contract available to government agencies. *Id*. With more than 7.5

million products and services from pre-vetted vendors, it is one of the largest contracts that

government agencies use to purchase technology products and services. *Id*.

64.     Providers, including distributors and re-sellers, directly apply to the GSA to be an

IT Schedule 70 contract holder. *See* "Sell through IT Schedule 70" on the GSA website available

at http://www.gsa.gov/technology/technology-purchasing-programs/it-schedule-70/sell-through-

it-schedule-70. For example, Carahsoft exclusively serves public sector customers, with the

majority of its income transacted through its GSA IT Schedule 70. In fiscal year 2016, federal

government agencies procured of $4 billion worth of software solutions through vendors that

hold the IT Schedule 70 contract, including Carahsoft, Emergent, and CDW-G.

## FACTS AND ALLEGATIONS APPLICABLE TO ALL COUNTS

### *Unlawful Kickbacks*

A. *Adobe Pays Illegal Kickbacks to Business and Premier Level Partners*

65.     Adobe operates an internal program called the Solution Partner Program ("SPP")

in order to encourage participants of the program, including distributors, re-sellers, and system

integrators, also referred to as partners herein, to assist and influence the sale of Adobe software

solutions to government customers. This program is publicized as one that facilitates deal

registration opportunities for entities that want to do business with Adobe and the government.

But there is a clear and recognized intent and financial motive by Adobe to affect the solicitation

of business with a particular government agency over competing software solution companies.

66.     The SPP primarily seeks to induce the sale and use of Adobe software solutions by targeting contractors who seek prospective government customers. On its face, the SPP may appear to be an above board rewards program. Adobe requires potential partners to join the SPP, advertising general benefits for deal registrations to partners at the community level, business level, and premier level. A chart showing the breakdown of benefits provided to partners is available here - https://solutionpartners.adobe.com/home/program/benefits.html, and a portion of the chart is provided below:





67.     Adobe provides general information regarding the SPP, including descriptions of the different levels, requirements of being a partner, and benefits, but it is not until a participant gains access to the restricted SPP portal system as a partner, do they have full disclosure to the onset of a kickback scheme. In fact, by clicking on the tab "Solution Partner Program Guide" on

Adobe's SPP website, a potential participant is immediately asked to sign-in as a partner to obtain more information, as shown here:



68.     Thus, a non-partner has no way of knowing at the outset what the SPP really is intended to do – operate a kickback program, completely disregarding the AKA and other relevant rules and regulations that prohibit kickbacks in government procurement.

69.     Once a partner is accepted into the SPP, partners[4] gain access to the restricted SPP portal system. Through the portal, partners create prospective deal registration opportunities by naming potential government customers. However, it is not until partners attain business or premier level they have access to the Adobe Salesforce.com – an internal data and records platform that show upcoming deal opportunities. The official term used at Adobe for this process is Deal Registration.

---

[4] Partners accepted to the SPP start at the community level.

70.     The purpose of the SPP is to provide an exclusive program, process, and software application for Adobe sales teams to closely work with partners in closing a deal opportunity. In other words, the SPP invites partners to team up with sales representatives to deliver Adobe software solutions to the appropriate government customer.

71.     Critical to the facts of this case is that partners at the community level have the opportunity to move up to business level status. A partner is required to produce at least $1-2 million of revenue through deal bookings in order to obtain business level status. Once a partner rises to the business level, it can qualify for kickback payments directly from Adobe. Kickbacks are only paid on new software license revenue.

72.     Accordingly, the Deal Registration process requires the partner to nominate themselves under three categories of sales influence: 1) Sourcing a Lead; 2) Qualifying a Lead; and 3) Co-Selling.

73.     Each category indicates the partner's level of involvement and engagement in the sales transaction and based on the nomination, each partner at either the business or the premier level[5], receives a 5% incentive per category, for a total of 15% capped at $150,000.00.

74.     For example, if the deal was "sourced" and "qualified" by the partner, working with Adobe in two sales categories, Adobe pays the partner up to a total amount of $100,000.00 ($50,000.00 per category for "sourcing" and "qualifying"). As shown in the chart below, incentive rewards increase along with the partner's level of influence:

_____

[5] Community level partners that register deal opportunities receive certain benefits provided under the SPP but are excluded from specific financial incentives listed in the Deal Registration Guidelines, which are limited to partners at the business and premier levels.





| | Reward Level | Pre-Sales Stage 1 | Sales Stage 1-3 | Sales Stage 4-Close |
|---|---|---|---|---|
| | | Source of Lead 5% | Sourcing/Qualifying 5% | Co-Selling 5% |
| 5% | | Adobe | Adobe | Adobe & Partner |
| 5% | | Partner | Adobe | Adobe & Partner |
| 10% | | Adobe | Partner | Adobe & Partner |
| 10% | | Partner | Partner | Adobe |
| 15% | | Partner | Partner | Adobe & Partner |

You do not need to transact the sale to receive any of the above rebates. A single partner may be eligible for multiple rebate rewards not to exceed a combined total of 15% or USD 150,000 on a single sales opportunity unless pre-approved by adobe (for a maximum of $50,000 in each category).

*See* Adobe Deal Registration Guidelines, October 19, 2016, at p. 3.

75.     Once the registration for the incentive is approved and the transaction is completed, the partner is required to submit a Proof-of-Involvement ("POI") to Adobe, showing documentation for each incentive category, including how the partner identified the deal, how the partner qualified the deal, and/or how the partner engaged in co-selling, alongside Adobe's sales representative. A portion of the deal registration guidelines explaining required documentation is as follows:

Providing documentation for each incentive category should include the following:

- Source of Lead (Sales Stage 1 or earlier) - documents showing how you uncovered or generated the lead.
- Sourcing (Sales stage 1 to 3) - documents demonstrating how you qualified the opportunity, including:
  - Acknowledgement of a confirmation of budget, project timeline, and willingness to consider Adobe products within the solution design.
  - Confirmation of your involvement in having Adobe named in the RFQ, RFP, tender, or bid response.
    *Note: When Adobe is already named in the RFQ, RFP, RF(x), or tender the Partner is no longer eligible for sourcing, but can still qualify for Co-Selling.*
- Co-Selling (Sales stage 4 to Deal Close) - documents validating your co-selling involvement alongside the Adobe Sales Team, including:
  - Evidence of meetings between the client and the Adobe Sales team.
  - Proof of concept (POC) documents or demonstrations that utilizes the products recommended in the registration.
  - Statement of work (SOW), proposal, recommendation or other formal communication to the end user with Adobe products as significant component.

*See Adobe Deal Registration Guidelines*, October 19, 2016, at p. 4.

76.     Accordingly, Adobe pays up to $50,000.00 per category of influence. Should the partner qualify for all three categories and the total deal value matches or exceeds $1,000,000.00, the partner automatically qualifies for a maximum payment of $150,000.00.

77.     Kickback payments are capped at $150,000.00 or 15% of a software solutions purchase at $1,000,000.00. Sales exceeding $1,000,000.00 do not receive additional kickbacks.

78.     Adobe does not pay kickbacks to a partner until the sales opportunity is closed and booked as Adobe sales revenue. Kickback payments are never disclosed to the government.

79.     In short, by virtue of registering deals under the SPP, a partner is paid an unlawful kickback for completing the sale of Adobe software to government customers and unduly influencing government customers, wrongfully inducing the government to purchase Adobe's licensed products and services.

80.     Such a kickback scheme directly violates the AKA because first, Adobe is an "agent of a prime contractor [- Carahsoft -] with the United States." *See Alsco-Harvard Fraud Litigation*, 523 F. Supp. at 807 (To recover under the AKA, relator must establish that a payment

was paid by a subcontractor to an employee or agent of a prime contractor with the United

States, or of a higher tier subcontractor under such a prime contract). Here, Carahsoft is the

master GSA Schedule holder for Adobe software solutions. In other words, while the partner and

the Adobe sales team engage in deal registration for a government customer, it is Carahsoft,

under its GSA Schedule,[6] that allows partners to act as agents or teaming partners under its GSA

Schedule with those business partners billing the government for payment. In fact, without

Carahsoft, a deal registration influenced and closed by Adobe and a partner, could *not* be paid for

by the government.

81.     Adobe's kickback scheme also satisfies the second element for recovery under the

AKA because Adobe paid partners up to $150,000.00 for inducing government customers to

purchase Adobe software solutions, all at the expense of other competing software options that

were subject to "best value" techniques defined in FAR 2.101, regarding the agency's needs. *See*

*Alsco-Harvard Fraud Litigation*, 523 F. Supp. at 807 (To recover under the AKA, relator must

also establish that payments were made as an inducement for the award of a subcontract or order

from the prime contractor of any subcontractor, or as an acknowledgement of a subcontract

previously awarded); *see also* FAR 2.101 ("'Best value' means the expected outcome of an

acquisition that, in the Government's estimation, provides the greatest overall benefit in response

to the requirement.").

82.     Moreover, the kickback scheme also violates the FCA because by paying

kickbacks to its partners under the SPP, Adobe causes the creation and submission of false

and/or fraudulent records, statements, and claims to the government, fraudulently inducing the

government to purchase Adobe products, that otherwise would not have been purchased, had the

---

[6] Since at least December 20, 2011, Carahsoft holds Adobe's "Letter of Supply," which makes Adobe products and services available under its GSA Schedule.

government known that Adobe was fraudulently operating the SPP and conspiring with its business level partners to sell its products.

83.     In addition, many of the partners, which were also resellers like Emergent and CDW-G, not only received kickbacks but also gained an upfront profit margin by obtaining access to a discounted rate for Adobe products and services, which enabled them to sell to the government at a profit even before receiving the kickback.

84.     Thus, in practice, not only did Adobe funnel kickbacks to partners in exchange for securing government contracts but it also provided discounts to resellers, creating the possibility for some partners to make money on both the upfront transactional profit and then later on the kickback from Adobe after the sale. The fact that Adobe partners were incentivized and biased to promote Adobe products over competitive products in this way was never once disclosed to the government customer.

85.     Financial figures obtained from a weekly report compiled and distributed to partner sales manager teams by Adobe headquarters indicate the massive amounts of revenue that Adobe accrued as a result of its kickback scheme, in fiscal years 2015 and 2016, when Relator Dowless was employed as Adobe's Senior Partner Sales Manager for the DoD and Intelligence Community government division.

86.     In fiscal year 2015, Adobe paid at least $3,045,931.31 in kickback payments. Such kickbacks fraudulently induced the government to spend at least $48,912,641.69 – an outrageous amount that would not have been paid for, had the government known about Adobe's fraud. Relator provides a spreadsheet[7] below showing some of the Deal Registrations from fiscal year 2015:

---

[7] Information provided in this spreadsheet is obtained from a weekly report that shows all business deals that were closed under the SPP. Adobe headquarters compiled and distributed the report to a platform

| Partner Source | Sourcing Partner: Account Name | Selling Partner: Account Name | Won | Percent | Total | Payout |
|---|---|---|---|---|---|---|
| Partner Sourced | EMERGENT, LLC | EMERGENT, LLC | $1,708,105.08 | 15.00% | $256,215.76 | $150,000.00 |
| Partner Sourced | Information Analysis, Inc. | Information Analysis, Inc. | $136,770.00 | 15.00% | $20,515.50 | $20,515.50 |
| Partner Sourced | Deloitte Consulting | Deloitte Consulting | $748,266.90 | 15.00% | $112,240.04 | $0.00 |
| Partner Sourced | EMERGENT, LLC | EMERGENT, LLC | $727,416.06 | 15.00% | $109,112.41 | $109,112.41 |
| Partner Sourced | EMERGENT, LLC | EMERGENT, LLC | $1,174,429.50 | 15.00% | $176,164.43 | $150,000.00 |
| Adobe Sourced | (blank) | nizdesigns | $789,165.00 | 5.00% | $39,458.25 | $39,458.25 |
| Adobe Sourced | (blank) | EMERGENT, LLC | $51,055.56 | 5.00% | $2,552.78 | $2,552.78 |
| Adobe Sourced | (blank) | EMERGENT, LLC | $0.00 | 5.00% | $0.00 | $0.00 |
| Adobe Sourced | (blank) | EMERGENT, LLC | $1,186,755.00 | 5.00% | $59,337.75 | $59,337.75 |
| Partner Sourced | EMERGENT, LLC | EMERGENT, LLC | $120,384.00 | 15.00% | $18,057.60 | $18,057.60 |
| Adobe Sourced | (blank) | EMERGENT, LLC | $217,920.00 | 5.00% | $10,896.00 | $10,896.00 |
| Partner Sourced | Information Analysis, Inc. | Information Analysis, Inc. | $1,044,000.00 | 15.00% | $156,600.00 | $150,000.00 |
| Adobe Sourced | (blank) | Lima Consulting Group | $734,400.00 | 5.00% | $36,720.00 | $36,720.00 |
| Partner Sourced | EMERGENT, LLC | EMERGENT, LLC | $75,012.00 | 15.00% | $11,251.80 | $11,251.80 |
| Partner Sourced | EMERGENT, LLC | EMERGENT, LLC | $48,000.00 | 15.00% | $7,200.00 | $7,200.00 |
| Adobe Sourced | (blank) | Mackson Consulting, LLC | $93,950.00 | 5.00% | $4,697.50 | $4,697.50 |
| Partner Sourced | ICF Interactive | ICF Interactive | $269,200.20 | 15.00% | $40,380.03 | $40,380.03 |
| Partner Sourced | Mackson Consulting, LLC | Mackson Consulting, LLC | $181,329.66 | 15.00% | $27,199.45 | $27,199.45 |
| Partner Sourced | Holman's USA LLC | Holman's USA LLC | $396,000.00 | 15.00% | $59,400.00 | $59,400.00 |
| Partner Sourced | Holman's USA LLC | Holman's USA LLC | $247,500.00 | 15.00% | $37,125.00 | $37,125.00 |

87.    The spreadsheet above identifies the "source of lead," "sourcing" or "qualifying" partner and "co-selling" partner, the value of the deal, and the incentive percentage paid to each partner. The first column indicates the "source of lead," - either Adobe or the partner. The second column indicates the "sourcing" or "qualifying" partner. The third column indicates the "co-selling" partner. Each of these categories of participation is worth 5% of the deal value and capped at $50,000.00, for a maximum payout of $150,000.00 per partner, per deal. The "won" column indicates recognized Adobe new software license revenue attained in the sales transaction with the partner. The "percent" column indicates the total percentage payout of the deal revenue to the partner identified in each of the three categories. The "total" column is a multiplication of total percentage payout by deal revenue. The "payout" column denotes the payment to partner with cap applied.

---

(SalesForce.com) only accessible by sales team personnel. Since Relator Dowless no longer has access to the weekly reports posted on SalesForce, he provides this spreadsheet created at the time of his employment, which contains an extract of the information provided in the weekly report.

88.    Another portion of the same spreadsheet (below) identifies the government entity that purchased Adobe licenses and the sales opportunity named for the specific government business transactions:

| Account Name: Account Name | Opportunity Name | Record Type |
|---|---|---|
| US Department of Veterans Affairs-Veterans Administrat | VA - Web and Mobile Solutions - AEM Managed Services | DR |
| Department of Veteran Affairs (VHA Contracts) | VHA/Contracts - MN | DR |
| National Railroad Passenger Corporation | Amtrak AEM Platform Solution | DR |
| DOI Bureau of Reclamation (USBR) | USBR - Doc Security | DR |
| DOI Fish and Wildlife Service (FWS) | Dept of Interior - FWS - Document Security | DR |
| US Department of State | State - TSG AEM | DR |
| US Census Bureau | US Census Bureau - 2015 Carahsoft Adobe Analytics Migration | Internal |
| US Department of the Treasury, Bureau of the Fiscal Serv | Fiscal Services Renewal | Internal |
| Federal Deposit Insurance Corporation (FDIC) | FDIC-AEM-Sites-MS | DR |
| US Office of Personnel Management (OPM) | OPM-Macon-CP-Forms | DR |
| The World Bank | World Bank-AEM Forms1 | Internal |
| US Department of Education | ED - AMS | DR |
| Broadcasting Board of Governors | BBG - Analytics Upgrade | DR |
| US Merit Systems Protection Board | MSPB - AEM Forms - PDFG | DR |
| US Department of Housing and Urban Development | US Dept of Housing and Urban Development - AEM Document Security | DR |
| HHS Centers for Medicare & Medicaid Services (CMS) | SC-A-Carahsoft/CMS/ AEM Apps Mary /Davis | DR |
| US Department Of Health And Human Services (HHS) | Children's Bureau | DR |
| US Food and Drug Administration (FDA) | FDA MARCS | DR |
| DOE Consolidated Nuclear Security (CNS) | AEM Upgrade - CNS | DR |
| DOE Sandia National Laboratories | DOE -Sandia - PKI Forms Automation | DR |

89.    Similarly, in 2016, Adobe paid at least $1,632,273.62 in kickback payments. Such kickbacks fraudulently induced the government to spend at least $25,094,521.96 – another ridiculous dollar figure that would not have been paid for, had the government known about the kickback scheme. Relator provides a spreadsheet[8] below showing some of the Deal Registrations from fiscal year 2016:

---

[8] Information provided in this spreadsheet is obtained from a weekly report that shows all business deals that were closed under the SPP. Adobe headquarters compiled and distributed the report to a platform (SalesForce.com) only accessible by sales team personnel. Since Relator Dowless no longer has access to the weekly reports posted on SalesForce, he provides this spreadsheet created at the time of his employment, containing the information provided in the weekly report.

| Partner Source | Sourcing Partner: Acc | Selling Partner: Accou | Secon | M1 | EST Deal Size | Percent | Total | Payout |
|---|---|---|---|---|---|---|---|---|
| Partner Sourced | VML, Inc | VML, Inc | (blank) | $47,520.00 | $142,560.00 | 15.00% | $21,384.00 | $21,384.00 |
| Partner Sourced | Mirum | Mirum | (blank) | $638,490.00 | $1,915,470.00 | 15.00% | $287,320.50 | $150,000.00 |
| Partner Sourced | Four Point Solutions LTD | Four Point Solutions LTD | (blank) | $9,346.50 | $28,039.49 | 15.00% | $4,205.92 | $4,205.92 |
| Partner Sourced | Four Point Solutions LTD | Four Point Solutions LTD | (blank) | $94,750.00 | $284,250.00 | 15.00% | $42,637.50 | $42,637.50 |
| Partner Sourced | Deloitte Consulting | Deloitte Consulting | (blank) | $69,456.00 | $208,368.00 | 15.00% | $31,255.20 | $0.00 |
| Adobe Sourced | (blank) | Information Analysis, Inc | (blank) | $147,560.00 | $442,680.00 | 5.00% | $22,134.00 | $22,134.00 |
| Partner Sourced | ClearInfo | ClearInfo | (blank) | $300,772.00 | $902,316.00 | 15.00% | $135,347.40 | $112,789.50 |
| Adobe Sourced | (blank) | Casa (Direct.com LLC DBA | (blank) | $25,000.00 | $75,000.00 | 5.00% | $3,750.00 | $3,750.00 |
| Partner Sourced | CommunityForce Inc. | CommunityForce Inc. | (blank) | $109,562.00 | $328,686.00 | 15.00% | $49,302.90 | $0.00 |
| Adobe Sourced | (blank) | Quest Consultants LLC DB | (blank) | $829,940.00 | $2,489,820.00 | 5.00% | $124,491.00 | $41,497.00 |
| Partner Sourced | Deloitte Consulting | (blank) | (blank) | $334,340.00 | $1,003,020.00 | 10.00% | $100,302.00 | $0.00 |
| Partner Sourced | Triad Technology Partne | Triad Technology Partner | (blank) | $140,750.00 | $422,250.00 | 15.00% | $63,337.50 | $0.00 |
| Partner Sourced | RealEyes | RealEyes | (blank) | ########### | $1,950,000.00 | 15.00% | $292,500.00 | $150,000.00 |
| Partner Sourced | Deloitte Consulting | Deloitte Consulting | (blank) | $122,757.93 | $368,273.79 | 15.00% | $55,241.07 | $0.00 |
| Partner Sourced | Deloitte Consulting | Deloitte Consulting | (blank) | $48,031.00 | $144,093.00 | 15.00% | $21,613.95 | $0.00 |
| Partner Sourced | EMERGENT, LLC | EMERGENT, LLC | (blank) | $932,504.87 | $2,797,514.61 | 15.00% | $419,627.19 | $150,000.00 |
| Adobe Sourced | (blank) | EMERGENT, LLC | (blank) | $99,475.20 | $298,425.60 | 5.00% | $14,921.28 | $14,921.28 |
| Partner Sourced | Bates Creative | Bates Creative | (blank) | $50,000.00 | $150,000.00 | 15.00% | $22,500.00 | $22,500.00 |
| Partner Sourced | Holman's USA LLC | Holman's USA LLC | (blank) | $27,446.00 | $82,338.00 | 15.00% | $12,350.70 | $12,350.70 |
| Partner Sourced | Managing Editor Inc. | Managing Editor Inc. | (blank) | $19,500.00 | $58,500.00 | 15.00% | $8,775.00 | $8,775.00 |
| Adobe Sourced | (blank) | GovConnection | (blank) | $32,254.00 | $96,762.00 | 5.00% | $4,838.10 | $4,838.10 |
| Adobe Sourced | (blank) | GovConnection | (blank) | $0.00 | $0.00 | 5.00% | $0.00 | $0.00 |
| Adobe Sourced | (blank) | INSIGHT DIRECT USA | | $66,614.01 | $199,842.03 | 5.00% | $9,992.10 | $9,992.10 |
| Adobe Sourced | (blank) | CDW | | $260,148.22 | $780,444.67 | 5.00% | $39,022.23 | $39,022.23 |
| Partner Sourced | EMERGENT, LLC | EMERGENT, LLC | (blank) | $323,906.00 | $971,718.00 | 15.00% | $145,757.70 | $145,757.70 |
| Partner Sourced | EMERGENT, LLC | EMERGENT, LLC | (blank) | $0.00 | $0.00 | 15.00% | $0.00 | $0.00 |
| Partner Sourced | Information Analysis, In | Information Analysis, Inc | (blank) | $689,829.41 | $2,069,488.23 | 15.00% | $310,423.23 | $150,000.00 |
| Adobe Sourced | (blank) | EMERGENT, LLC | (blank) | $40,800.00 | $122,400.00 | 5.00% | $6,120.00 | $6,120.00 |
| Adobe Sourced | (blank) | EMERGENT, LLC | (blank) | $31,680.00 | $95,040.00 | 5.00% | $4,752.00 | $4,752.00 |
| Adobe Sourced | (blank) | EMERGENT, LLC | (blank) | $29,297.83 | $87,893.48 | 5.00% | $4,394.67 | $4,394.67 |
| Partner Sourced | EMERGENT, LLC | (blank) | (blank) | $43,209.67 | $129,629.00 | 10.00% | $12,962.90 | $12,962.90 |
| Adobe Sourced | (blank) | EMERGENT, LLC | (blank) | $24,000.00 | $72,000.00 | 5.00% | $3,600.00 | $3,600.00 |
| Adobe Sourced | (blank) | EMERGENT, LLC | (blank) | $625,000.00 | $1,875,000.00 | 5.00% | $93,750.00 | $50,000.00 |
| Adobe Sourced | (blank) | Government Acquisitions | (blank) | $136,295.00 | $408,885.00 | 5.00% | $20,444.25 | $20,444.25 |
| Partner Sourced | EMERGENT, LLC | EMERGENT, LLC | (blank) | $94,000.00 | $282,000.00 | 15.00% | $42,300.00 | $42,300.00 |
| Partner Sourced | Holman's USA LLC | Holman's USA LLC | (blank) | $72,000.00 | $216,000.00 | 15.00% | $32,400.00 | $32,400.00 |
| Partner Sourced | Mackson Consulting, LLC | Mackson Consulting, LLC | (blank) | $460,000.00 | $1,380,000.00 | 15.00% | $207,000.00 | $150,000.00 |

90.     Another portion of the same spreadsheet (below) identifies the government entity that purchased Adobe licenses and the sales opportunity named for the specific government business transactions:

| Account Name: Account Name | Opportunity Name |
|---|---|
| US Department of Veterans Affairs-Veterans Administration (VA) | VA Community Care Outreach Communica |
| The World Bank | World Bank - Target |
| DOT Federal Aviation Administration (FAA) | FAA HQ-AEM Mobile ETLA |
| DOE Sandia National Laboratories | Cardosi/DOE_Sandia/Assets |
| Federal Reserve Bank of NY | Fed Reserve Bank- DPS ETLA |
| US Department of Justice (DOJ) | AEM:VC_Amer_CS_US Trustees |
| DOJ Executive Office For US Trustee | AEM:VC_Amer_CS_US Trustees (Update D |
| DOJ Federal Bureau of Investigation (FBI) | AEM:VC_Amer_CS_FBI |
| US Courts Administrative Office | U.S. Courts AEM Forms Limited RE |
| Amtrak | Amtrak - Union Station - Target - T |
| US Department of Veterans Affairs-Veterans Administration (VA) | AEM Mobile Early Migration for DR1531856 |
| US Department of Veterans Affairs-Veterans Administration (VA) | VA Community Care Outreach - Campaign |
| US Government Printing Office (GPO) | GPO-AEM Forms-T |
| US Office of Personnel Management (OPM) | OPM-AEM Forms/OP-P |
| World Bank | World Bank-Analytics-T |
| US Census Bureau | Census-Sites-2 |
| US Office of Personnel Management (OPM) | OPM-AEM Forms (OP2)-P |
| World Bank | World Bank-MS (Sites) T |
| US Department of Treasury Office of the Comptroller of the Currency (OCC) | Treas-OCC-CCom |
| USDA Forest Service | USDA - eForms - AEM Forms - T - Lean Forw |
| US Department of Energy Kansas City Plant | Energy - Kansas City Plant - Forms - T |
| HHS Centers for Medicare and Medicaid Services(CMS) | CMS - RDPG - FORMS - T |

91.     As indicated in the charts, entities participating in the SPP include various resellers, distributors, and other government IT providers. Over the course of the two years, Adobe paid kickbacks to business level partners, totaling $4,667,318.83 in order to fraudulently induce government customers to use and purchase Adobe software solutions, generating excessive revenue from deals totaling at least $74,007,163.64.

92.     In summary, Adobe offers illegal remuneration to its partners in order to fraudulently induce the government to procure Adobe software solutions. This kickback scheme causes the government to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its partners under the SPP, Adobe also causes the creation and submission of false and fraudulent records, statements, and claims to the government. Adobe's failure to disclose the specifics of financial incentives provided to each partner to the government, deprives public sector customers from access to "best value" pricing.

30

93.     To support allegations of the fraud, Relator Dowless provides substantial information related to a subset of Adobe products and services, which includes software applications such as AEM forms under the Adobe Marketing Cloud. However, the fraud goes back to at least December 1, 2011 and the kickback scheme affects multiple business units of Adobe, including Creative, Adobe Connect, in addition to the Marketing Cloud and Experience Cloud products and services. In other words, the fraud is far more wide ranging and extensive than the records Relator Dowless could access.

94.     Relator Dowless provides the following as representative deal registration examples to illustrate the fraud, which in practice, stifles fair and reasonable contract pricing used in government procurement. In support, he also discloses internal communications between Adobe sales team personnel and partners.

***Adobe and "ClearInfo" Deal Registration with the Department of Defense***

95.     By way of example, on or about November 18, 2014, Rich Baumel, Account Executive at Adobe, identified a deal opportunity with the DoD Defense Logistics Agency ("DLA"). Specifically, Mr. Baumel teamed up with ClearInfo under the SPP to close a deal with the DoD DLA.

96.     ClearInfo purchased software from Carahsoft. In effect, Carahsoft signed an agent agreement with ClearInfo, who in turn, distributed Adobe software to DoD DLA. At the close of the deal, DoD DLA invoiced and paid $1,392,822.00, utilizing Carahsoft's GSA Schedule and contract pricing deemed to be the "best value." DoD DLA was not aware that kickback payments to ClearInfo were inflating its final procurement price.

97.     Adobe collected a net license and support revenue of $902,316.00 and paid ClearInfo a kickback worth 15% of the net revenue minus maintenance and support fees, totaling $112,789.50.

98.     On or about November 15, 2016, Christopher Robins, owner of ClearInfo emailed Relator Dowless, asking why he was not paid a larger kickback and stating that "[p]er work done, [ClearInfo was] eligible for an additional $37,210.50":

**From:** Chris Robins ▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, November 15, 2016 3:51 PM
**To:** D. Alan Dowless ▮▮▮▮▮▮▮▮▮
**Subject:** Re: deal registration guidelines

Alan, following up on the DLA deal that was closed recently.   The value of the deal was $1,392,822.00.

Per the table you provided ClearInfo is eligible to receive the 15% level on each of the stages describe base on work we did to support the closing of DLA.

To date we have received an reward of $112,789.50.  Per work done we are eligible for an additional $37,210.50.

I look forward to discussion this with you in the near future.

I am available at 5pm today Tuesday November 15th and Wednesday November 16th from 2:30 to 4pm or after 5pm.

Best, Chris


Chris Robins
President
ClearInfo
▮▮▮▮▮▮▮▮▮▮

99.     In response, Relator Dowless tracks down the deal and explains that ClearInfo will be paid an amount worth 15% of the net license revenue minus maintenance and support fees - $751,930.00, and that ultimately ClearInfo would get paid a total of $112,789.50:

**From:** D. Alan Dowless
**Sent:** Tuesday, November 15, 2016 4:00 PM
**To:** 'Chris Robins' ████████████████
**Subject:** RE: deal registration guidelines

Hi Chris, I found the deal, it closed in March 2016 for 902,316.000, you were provided 15% of the eligible amount of 751,930.  The delta was maint/support which is not eligible for payout, only license.

I hope this helps.

Thanks,

1

alan

| Payout Information | |
|---|---|
| Adobe Sales Order Number | 140553304 |
| ECC Sales Order Number | 140553304 |
| Order Close Date | 3/3/2016 |
| Estimated Payout Date | 6/2/2016 |
| Payout Status | Paid |
| Ineligible Reason | N/A |

**D. Alan Dowless**
Senior Partner Sales Manager
Adobe Public Sector

Mobile: ████████

7930 Jones Branch Drive 5th floor
McLean, VA, 22102, USA
www.adobe.com

| Payout Information | | | | |
|---|---|---|---|---|
| Adobe Sales Order Number | 140553304 | | Memo / Reference # | Solution Partner_05/01/2016 |
| ECC Sales Order Number | 140553304 | | Eligible Amount | 751,930.000 |
| Order Close Date | 3/3/2016 | | Payout Amount | 112,789.50 |
| Estimated Payout Date | 6/2/2016 | | Payout Rate | 15.00% |
| Payout Status | Paid | | | |
| Ineligible Reason | N/A | | | |

| From: | D. Alan Dowless |
|---|---|
| Sent: | Tuesday, November 15, 2016 4:54 PM |
| To: | 'Chris Robins' |
| Subject: | RE: deal registration guidelines |

Here is the deal breakdown, add up all license and quantity, you'll get 751,930 in new license, the 15% payout was applied to that amount.  Remember maint/support not used only license.

BTW, you should be able to see all of this in your partner portal.

Alan

**Products (Standard Price Book)**     [Add Product] [Edit All] [Choose Price Book] [Sort]

| Action | Product | Product Code | Quantity |
|---|---|---|---|
| Edit \| Del | AEM 6.0:OPP USERS | AEM | 5.00 |
| Edit \| Del | AEM 6.1:OPP ADD-ON COMMERCE | AEM | 1.00 |
| Edit \| Del | AEM FORMS 6.0:OPP | AMFS | 2.00 |
| Edit \| Del | AEM FORMS:PLATINUM M&S 1L | AMFS | 2.00 |
| Edit \| Del | AEM SITES 6.0:OPP | AEMS | 1.00 |
| Edit \| Del | AEM SITES 6.0:OPP ADDL INSTANCES | AEMS | 1.00 |
| Edit \| Del | AEM SITES:PLATINUM MAINT & SUPPORT 1L | AEMS | 1.00 |
| Edit \| Del | AEM SITES:PLATINUM MAINT & SUPPORT 1L | AEMS | 1.00 |
| Edit \| Del | AEM SITES:PLATINUM MAINT & SUPPORT 1L | AEMS | 5.00 |
| Edit \| Del | AEM SITES:PLATINUM MAINT & SUPPORT 1L | AEMS | 1.00 |

**D. Alan Dowless**
Senior Partner Sales Manager    Mobile: ██████
Adobe Public Sector

7930 Jones Branch Drive 5th floor
McLean, VA, 22102, USA
www.adobe.com

100.     Here, as an initial matter, Mr. Robins' role as the business level partner is supposed to be a neutral advisor in selecting software solutions for procurement. Yet, the fact that Mr. Robins points out to Relator Dowless that its company should be paid a higher financial incentive, confirms that the kickback scheme not only distorts the level of engagement and involvement business level partners are expected to provide to government customers, but also confirms that business level partners are fully aware of the kickback scheme and are proactive in getting paid, further facilitating the fraud with Adobe.

***Adobe and "I3ICS" Deal Registration with the Navy***

101.     In another representative example, Adobe and its business level partner, I3 Integrative Creative Solutions ("I3ICS") closed a deal with the Navy, on or about May 22, 2015.

34

102.     Specifically, Phil Oakley, the owner of I3ICS, created the deal registration to help John O' Leary, Account Executive at Adobe, close the deal. As a result, Adobe collected a net revenue of $767,043.00. A portion of the sales order showing the Navy's purchase of AEM forms is as follows:



103.     Specifically, this is an example of Carahsoft's role in the kickback scheme, in which it has privity of contract with the Navy to execute the deal registration and ultimately distribute and bill for Adobe software solutions. In fact, the terms and conditions of the sales order expressly state such a contractual relationship in which Adobe promises to provide software products to Carahsoft for distribution through I3ICS to the Navy:

**Sales Order Terms and Conditions**

1. The parties are entering into a transaction whereby Adobe Systems Incorporated ("Adobe") will provide certain Adobe software products ("Licensed Products") and/or maintenance and support services ("Support") on a term basis for 36 months to Carahsoft Technology Corp. ("Carahsoft") for distribution through i3 Integrative Creative Solutions ("Reseller") to the US Navy – Personnel Command ("Customer") through the reseller awarded the contract for the Licensed Products by Customer ("Reseller") under the Master Government Channel Enterprise Distribution Agreement (Ref# 427347) between Adobe and Carahsoft. Adobe hereby provides Carahsoft the following discount for a single sales opportunity ("Opportunity") with Customer effective on the date of delivery of the Licensed Products ("Effective Date").

104.   After the deal closed, on or about February 19, 2016, Mr. Oakley emailed Relator

Dowless asking about its kickback payment. He explained that I3ICS only received $37,000.00,

instead of $115,000.00.

105.   In response, Relator Dowless tracks down the deal and explains that there was a

clerical error with the SPP Deal Registration. In or about March 2016, Adobe paid I3ICS a total

of $77,835.00, fixing the error. Relator provides his email exchange with Mr. Oakley:

On Fri, Feb 19, 2016 at 5:17 PM, D. Alan Dowless ███████████████ wrote:

Hello Phil, I am your Partner Sales Manager, replacing Mark Potenzone who was promoted and is now my manager. Barb Evans brought to my attention that you were short-paid on DR1564298 to NPC for $767K. I have reviewed the record and found that i3ics was only paid on the first year, $248K, of a 3 year deal. I believe that the deal reg auditors may have been confused about the 2nd and 3rd years since they were different amounts.

I have opened a case on your behalf with HQ making the case that I3ICS should be paid on the entire amount.

In the future, please allow me to assist you with matters related to our partner program. Please let me know when you have availability for an introduction.

I will keep you posted on my findings.

Thanks,

Alan

-------- Original message --------
From: Phil Oakley ███
Date: 2/22/2016 2:00 PM (GMT-05:00)
To: "D. Alan Dowless' ███        Bobbi Sorrell ███
Cc: Barbara Evans ███
Subject: Re: DR1564298

Mr Dowless
Can you tell me what we were paid on the 247K and where exactly that money went We are having a hard time finding this so the specific amount that was paid and when it was paid and to which account the funds were sent will greatly assist us.

VR phil

| From:    | D. Alan Dowless |
| Sent:    | Monday, February 22, 2016 3:38 PM |
| To:      | Phil Oakley; Bobbi Sorrell |
| Cc:      | Barbara Evans |
| Subject: | RE: DR1564298 |

HI Phil. 37k was deposited into the bank account you identified in the w9 that you filled out when joining the program

If u don't have that forms I can try to track it down

Thx alan

Sent via the Samsung Galaxy S® 6, an AT&T 4G LTE smartphone

| From:    | D. Alan Dowless |
| Sent:    | Monday, February 22, 2016 4:04 PM |
| To:      | 'Phil Oakley'; Bobbi Sorrell |
| Cc:      | Barbara Evans |
| Subject: | RE: DR1564298 |

Hello Phil, do you have the W9? I'm also checking with HQ, you can always request this information from spphelp@adobe.com and sppdealreg@adobe.com I will let you know what I find out, I'm still awaiting a resolution of the eligible amount, I will need to provide the PO/Invoice/Quote data as backup and Barbara is getting that for me from Carahsoft.

Here's the information that I have from the portal

▼ Payout Information

| Adobe Sales Order Number | 139789539 | | Memo / Reference # | Solution Partner_06/01/2015 |
|---|---|---|---|---|
| ECC Sales Order Number | 139789539 | | Eligible Amount | 248,144.960 |
| Order Close Date | 5/21/2015 | | Payout Amount | 37,221.74 |
| Estimated Payout Date | 6/24/2015 | | Payout Rate | 15.00% |
| Payout Status | Paid | | | |
| Ineligible Reason | N/A | | | |

**From:** Bobbi Sorrell ▆▆▆▆▆▆▆▆
**Sent:** Monday, February 22, 2016 4:21 PM
**To:** D. Alan Dowless
**Cc:** Phil Oakley; Barbara Evans
**Subject:** Re: DR1564298

Alan,
Thank you, this was helpful.  We did receive $37,221.74 on June 29th.

I

*Bobbi Sorrell*
*6564 Loisdale Court, Suite 1010B*
*Springfield, VA 22150*
▆▆▆▆▆▆▆ *(cell and best #)*
          *(Office)*
          *(Fax)*

NOTICE - CONFIDENTIAL: The information in this email is confidential and may be legally
prohibited and may be unlawful. When addressed to persons with whom we have a busin

106.    In addition, Relator Dowless also provides his email chain with the Adobe sales

team. Here, he reaches out to SPP staff in efforts to track pending kickback payments to I3ICS:

**From:** D. Alan Dowless
**Sent:** Saturday, February 20, 2016 3:43 AM
**To:** Solution Partner Helpdesk ▆▆▆▆▆▆ DL-SPPDealReg ▆▆▆▆▆▆▆
**Cc:** Mark Potenzone ▆▆▆▆▆▆
**Subject:** DR1564298 - deal reg payment not correct

Hello SPP and SPPDealReg,

Please take a look at the deal reg payment on this oppty
DR1564298
https://adobe.my.salesforce.com/0061400001CDImG

The partner was entitled to deal reg of 15% on 767K, but was only paid 15% on $248K, or the first year only.  This deal was all new license confirmed by the adobe sales
rep and sales manager.  Possibly this was related to the unusual situation where year 2 and year 3 were different amounts for same product.

Please review and  adjust payment to partner.

Thanks,
Alan

**From:** Maruthi Kumar
**Sent:** Monday, February 22, 2016 11:56 AM
**To:** D. Alan Dowless
**Cc:** Mark Potenzone ████████████ DL-SPPDealReg - ████████
**Subject:** RE: DR1564298 - deal reg payment not correct

Hi Alan,

Thank you for the email.

Since the below two line items were renewal the eligible amount is USD "248,144.960" and not USD "767k".

First two line items are treated as renewal hence the eligible amount dropped to USD "248,144.960".

| Deal Registration ID | Account Name: | GEO | Partner Role | Profit Center Name | Adobe SKU | Revenue Type | Reportable Renewal ASV Currency | Reportable Renewal ASV | Reportable Multi-Year Currency | Reportable Multi-Year Amount | Reportable New ASV Currency | Reportable New ASV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DR1564298 | US Navy - Personnel Command | Americas | Sourcing and Co-Selling | Adobe Experience Manager | 58051713 | Subscription | USD | 255606.52 | USD | 255606.52 | USD | 0 |
| DR1564298 | US Navy - Personnel Command | Americas | Sourcing and Co-Selling | Adobe Experience Manager | 58051713 | Subscription | USD | 263291.92 | USD | 263291.92 | USD | 0 |
| DR1564298 | US Navy - Personnel Command | Americas | Sourcing and Co-Selling | Adobe Experience Manager | 58051718 | New Licensing | USD | 0 | USD | 0 | USD | 248144.96 |

Do let me know if you have any questions, Happy to help.

Thanks
Maruthi

| Line Item Eligible | Eligible Revenue | Payout Percentage | Total Payout Amount Currency | Line Item Payout Amount |
|---|---|---|---|---|
| Ineligible - Renewal | - | 15% | USD | - |
| Ineligible - Renewal | - | 15% | USD | - |
| Eligible | 248,144.96 | 15% | USD | 37,221.74 |

107.  I3ICS' bank account information is also discussed, confirming that Adobe

directly deposits kickback payments to partners:

**From:** D. Alan Dowless
**Sent:** Tuesday, February 23, 2016 2:30 AM
**To:** Maruthi Kumar ████████████
**Cc:** Mark Potenzone ████████████ DL-SPPDealReg ████████████
**Subject:** RE: DR1564298 - deal reg payment not correct

Hello Maruthi,

Can you please provide the bank name that the $37K was deposited into?  The partner has been unable to identify payment due in June 2015.

Thanks,
Alan

**From:** Maruthi Kumar
**Sent:** Tuesday, February 23, 2016 9:02 AM
**To:** D. Alan Dowless
**Cc:** Mark Potenzone ████████████ DL-SPPDealReg ███████████
**Subject:** RE: DR1564298 - deal reg payment not correct

Hi Alan,

Please find the banking information for the partner "**3 Integrative Creative Solutions, LLC dba i3 ICS**".



| Filter Results: | |
|---|---|
| ▼ **BANK OF AMERICA (FORMERLY NATIONSBANK VIRGINIA) - United States** | |
| Bank Name: | BANK OF AMERICA (FORMERLY NATIONSBANK VIRGINIA) |
| Bank Address: | 6478 LINCOLNIA RD |
| Bank City: | RICHMOND |
| Bank Country: | United States |
| Bank Postal Code: | — |
| Bank Account Holder Name: | 3 Integrative Creative Solutions, LLC dba i3 ICS |
| Account Number: | ██████████ |
| Bank Account Currency: | USD - American Dollar |
| IBAN Number: | — |
| Account Type: | — |
| ABA or ACH Routing Number: | 051000017 |
| SWIFT Code: | — |
| Bank Number: | — |
| Bank and Transit Code: | — |
| Sort Code: | — |
| Branch Name: | — |

108.    Ultimately, Adobe paid I3ICS a total amount of $115,056.51. Relator provides the rest of the email chain to show further discussion related to paying kickbacks:



**From:** D. Alan Dowless
**Sent:** Tuesday, February 23, 2016 7:35 PM
**To:** Maruthi Kumar ████████████
**Cc:** Mark Potenzone ████████████ DL-SPPDealReg ████████████
**Subject:** RE: DR1564298 - deal reg payment not correct

Hello Maruthi,

The partner has confirmed that they received the payment. However, we still have the issue of them not getting credit for the full 3 year acquisition. As stated in my last email, this is a new customer who committed to 3 years, each year we increased the payment slightly, so this was not a renewal, but a new customer that contracted for 3 years. As I understand it our partners should be paid on TCV for deals closed last year.

Please advise.

**From:** Maruthi Kumar
**Sent:** Tuesday, February 23, 2016 11:26 AM
**To:** D. Alan Dowless
**Cc:** Mark Potenzone ; DL-SPPDealReg
**Subject:** RE: DR1564298 - deal reg payment not correct

Hi Alan,

Thank you for the confirmation.

I am working with the compensation team to check on the TCV portion and once I get an update I will keep you informed.

**From:** D. Alan Dowless
**Sent:** Wednesday, February 24, 2016 8:21 AM
**To:** Maruthi Kumar
**Cc:** Mark Potenzone ; DL-SPPDealReg
**Subject:** RE: DR1564298 - deal reg payment not correct

Hello Maruthi, please PO's attached.  I think this should clear everything up, the order was placed for 3 years on May 21, 2015.

**From:** Maruthi Kumar
**Sent:** Wednesday, February 24, 2016 8:26 AM
**To:** D. Alan Dowless
**Cc:** Mark Potenzone ; DL-SPPDealReg
**Subject:** RE: DR1564298 - deal reg payment not correct

Hi Alan,

I have now fixed the TCV for the opportunity and shall process the remaining payout in upcoming month i.e. March 2016.

**From:** D. Alan Dowless
**Sent:** Wednesday, February 24, 2016 8:44 AM
**To:** Maruthi Kumar
**Cc:** Mark Potenzone                     DL-SPPDealReg
**Subject:** RE: DR1564298 - deal reg payment not correct

So the total revenue recognition for the DR will be 767K?  The amount of the entire 3 year deal correct?

**From:** D. Alan Dowless
**Sent:** Wednesday, February 24, 2016 7:16 PM
**To:** Maruthi Kumar
**Cc:** Mark Potenzone ; DL-SPPDealReg
**Subject:** RE: DR1564298 - deal reg payment not correct

Obviously, minus the amount already credited and paid on, $248K

Please confirm.

| | |
|---|---|
| **From:** | Maruthi Kumar |
| **Sent:** | Wednesday, February 24, 2016 11:03 AM |
| **To:** | D. Alan Dowless |
| **Cc:** | Mark Potenzone; DL-SPPDealReg |
| **Subject:** | RE: DR1564298 - deal reg payment not correct |

Yes Alan,

I will process the remaining payout amount in the month of march 2016.

### *Adobe and "RealEyes" Deal Registration with the CIA*

109.     Relator Dowless also provides an example of a deal registration that involved a business level partner that participated in substantial "co-selling." There is evidence of multiple meetings with the "client and the Adobe sales team" as well as proof of "formal communication to the end user with Adobe products." *See supra* at 23 for Adobe Deal Registration Guideline, which includes a description of the incentive categories.

110.     In or about April 2015, Mark Wales, Account Executive at Adobe, worked with RealEyes to pursue a deal registration with the CIA. In fact, David Hassoun's, owner of RealEyes, presence in sales efforts was significant. For example, from April 2015 thru July 2015, he held over 15 different meetings with the CIA, ultimately convincing the agency to procure Adobe products. A portion of an email from Mr. Hassoun to Mark Potenzone, Senior Partner Sales Manager for the government account division, reporting the meeting times, is as follows:

| From: | ▮▮▮▮▮▮ |
|---|---|
| Sent: | Tuesday, September 08, 2015 6:40 PM |
| To: | Mark Potenzone |
| Subject: | POI for DR1481225 |
| Attachments: | OSCMediaServerOptions.pdf; OSC-VODStreamingOptions.pdf; osc-streaming-flow02.pdf; osc_aws_diagram07.pdf |

Most of work and collaboration including the recommended direction which lead to the deal was done in our client interactions and meetings which have been ongoing for nearly the last year. Followed up by requirements gathering, and technology assessment and pairing work lead to a strong recommendation and technical development path that was vetted and proposed to the client. I think it also included a demo or 2 of some work we've done with other clients to show off some key features. However there was no slide deck.

Below you will find some of the original assessment and document that was shared with the client and used to spring board the discussion and eventual solution with the client.

Then this was followed up with multiple business and technical calls with Adobe and the product team paired with Mark Wales to handle from the business side. I provided the key use cases and technical insight as well as integration and development approach plan to meet client needs.

Approx Meeting Info:

Prior to a major meeting with John Collins and Mark Wales to work out the business side and validate some technical items on June 18th we had between 4 and 8 discussions with the client. Often during our weekly meeting a few 1:1 discussion starting in February and continuing through August. During those client facing meetings we discussed their long term options, goals and they asked for our recommendations and details. We went through multiple rounds discussing DRM and technical benefits of the proposed solution with comparative data, media flow architecture and details.

For some rough dates and estimations of meetings:
-   1 meeting during April direct with client
-   2 meeting month of May with client
-   1-2 meetings with adobe during the month of May
-   1-2 meetings with client month of June
-   1-2 meeting with adobe month of June
-   1 meetings with client month of July
-   1-2 meeting with adobe month of July
-   2-3 meeting with adobe month of June

Let me know if you would like any further specifics.

David Hassoun

111.    The email shows that RealEyes conducted numerous meetings with the

government client. With RealEyes' involvement, the deal closed on or about August 28, 2015.

112.    Carahsoft distributed and billed the CIA, Adobe collected a net revenue totaling

$4,268,323.00 and paid RealEyes $150,000.00 as a reward for its "co-selling" involvement.

***Adobe and "Mirum Agency" Deal Registration with the U.S. Marine Corps***

113.    In addition to monetary kickbacks, Adobe also offers its partners exclusive

invitations to sporting events, golf tournaments, and expensive dinners, for influencing the sale

of Adobe products to the government. A deal with the Marine Corps illustrates such a kickback

scheme.

114.     On or about May 26, 2016, Adobe and business level partner Mirum Agency ("Mirum") closed a deal with the Marine Corps, via USMC Recruiting and Advertising Contractor, J. Walter Thompson ("JWT").

115.     But the process to obtain the successful deal was everything but above board.

116.     As an initial matter, USMC contracts with Mirum to acquire neutral assessments of "best value" software solutions. As such, Mirum has a fiduciary duty to provide objective and neutral evaluation to the USMC.

117.     Instead, Mirum is directly influenced to encourage USMC to procure Adobe licenses, by virtue of kickbacks that are paid to Mirum.

118.     For example, Mr. O' Leary, Account Executive at Adobe, plied senior executives at Mirum and JWT with lavish meals and other benefits in exchange for promises to grant a multi-million dollar award to Adobe. In doing so, the USMC entrusted its long-time recruiting and advertising contractor, JWT, to make the final decision and acquisition via its funded multi-year contract with USMC.

119.     In 2015, the Adobe sales team found out that Michael Vaccaro, Chief Revenue Officer for Mirum, and Patrick West,[9] former Managing Director of Mirum and JWT, were working together to provide the Marine Corps with a digital marketing software upgrade. The Adobe sales team also knew that Mirum and JWT were in the middle of comparing Adobe software solutions with competing IT providers, including Oracle, IBM, and Acquia, for their upcoming work with the Marine Corps.

---

[9] Since leaving Mirum and JWT in April 2017, Adobe hired Mr. West in May 2017 as its Global Alliance Director.

120.     In order to influence Mirum and JWT in their selection of Adobe software over competitors, in or about February 2016, the Adobe sales team invited Mr. West to an all expenses paid Super Bowl held in Santa Clara, California.

121.     Relator Dowless provides multiple emails between Barry Leffew, former Vice President of Adobe's Public Sector and Garrett Ilg, head of Partners & Alliances at Adobe, exchanging information about Mr. Vaccaro and Mr. West and conspiring to influence Mirum and JWT, to in turn influence the Marine Corps on behalf of Adobe software solutions:

**From:** Barry Leffew █████████████
**Date:** Monday, January 25, 2016 at 12:01 PM
**To:** garrett █████████████
**Subject:** FW: Marines.com RFP Response (Mutual NDA and Intent To Bid) DUE TODAY

RFP came out Friday.  Right now we have this in Q2.  Schedule in RFP is to award by end of Feb.  It's about $1M a year in managed services.  FEDRAMP is a requirement.

They're senior execs will be at Super Bowl.

Thanks,
B

**Barry Leffew**
**Vice President**

**From:** Garrett Ilg
**Sent:** Monday, January 25, 2016 12:16 PM
**To:** Barry Leffew
**Subject:** Re: Marines.com RFP Response (Mutual NDA and Intent To Bid) DUE TODAY
**Importance:** High

Super – I will be sure to stay close to their execs at the game as well as track this with you .

Can you pls let me know when we get the NDA etc back to them today (before 4pm).   We want to run at this.

Do we have partner teams lined up as well – given the scope of this opportunity we want to be close to JWT.

Garrett

122.     The email exchange is a significant example of Adobe's senior executives leading and operating the culture of corruption. Such a brazen kickback scheme was being led by individuals like Mr. Leffew, for instance, who was at the time, the head of Adobe's $350 million

Public Sector business in the United States and Canada. Both Mr. Leffew and Mr. Ilg knew that their efforts to influence Mirum and JWT would ultimately affect the partners' decision to induce the Marine Corps to procure Adobe software solutions for the upgrade over other viable software solutions.

123.    Approximately 22 days after Mr. Vaccaro[10] attended the Super Bowl as an exclusive guest of the Adobe sales team, Mirum and JWT gave notice to Mr. Leffew and the rest of Adobe's Public Sector that they had decided to use Adobe products and services for its contract with the Marine Corps. The email from Relator Dowless to the Adobe partner sales management team, including Tony Sanders, Senior Director of Partner Sales and Mr. Potenzone, announcing the news is provided below:

**From:** D. Alan Dowless
**Sent:** Monday, February 29, 2016 1:34 PM
**To:** Tony Sanders ██████████████
**Cc:** Mark Potenzone ████████████████
**Subject:** RE: 2016-02-29 -- Dowless Forecast

UPDATE:  JWT has awarded marines.com to Adobe!  Now we have to get it processed this week.

alan

| | |
|---|---|
| From: | D. Alan Dowless |
| Sent: | Monday, February 29, 2016 1:39 PM |
| To: | Tony Sanders |
| Cc: | Mark Potenzone |
| Subject: | RE: 2016-02-29 -- Dowless Forecast |

Amazing story, we're in the Navy/Marines QBR, john o'leary's phone rings and it's Patrick west from JWT, john put him on speaker and he announced that Adobe won! What a well-timed unbelievable announcement.

---

[10] Mr. Vaccaro attended the Super Bowl in place of Mr. West because Mr. West could not attend.

124.   In response to the impending close of the deal registration with the Marine Corps, on or about April 28, 2016, Adobe invited Mr. West to an all expenses paid golf tournament held in Pebble Beach, California.

125.   Mr. West attended the three-day rendezvous (September 26-28, 2016), golfing and going to cocktail receptions and dinners with a number of key senior executives at Adobe, including Shantanu Narayen, Adobe CEO, Matt Thompson, Adobe COO, and Mr. Ilg. Below is an email confirming the event dates and listing Mr. West on the guest list:

| | |
|---|---|
| **From:** | Jocelyn Michels Stufflebean |
| **Sent:** | Tuesday, April 26, 2016 6:23 PM |
| **To:** | Robbie Traube; Donald Matejko; Salvatore Scilingo; Steven Plous; DL-Americas Sales Teams |
| **Cc:** | Jocelyn Michels Stufflebean; Ben Rabner |
| **Subject:** | 2016 Pebble Beach Executive Golf & Cycling Program (Status Update as of 4/26/16) |
| **Attachments:** | 2016 Adobe Pebble Beach Golf_Cycling Event FAQ For Customers_Partners.pdf; 2016 Adobe Pebble Beach Golf_Cycling Program - Internal Only.pdf; Pebble Beach Golf Program Nominations_Confirmations.xlsx |

Please forward to your teams.



**Adobe Pebble Beach Golf & Cycling Program**
Pebble Beach Golf Resort
Pebble Beach, CA

| Confirmed Event Date | Company | Full Name | Title | Golf/Cycling |
|---|---|---|---|---|
| **Sept 26-28, 2016** | **JWT** | Patrick West | **Managing Director** | Golf |

THE ADOBE PEBBLE BEACH GOLF EVENT PROGRAM INCLUDES:

This intimate gathering of top Adobe and customer executives offers the unique opportunity to learn more about Adobe and build relationships with Adobe's senior executive team and your peers, while playing one of the most beautiful golf courses in the world or cycling breathtaking coastal roads.

- 2 nights at The Lodge at Pebble Beach
- 2 rounds of golf (Caddies included)
- Golf clinic at the Pebble Beach's Golf Academy (Full swing, putting, bunker/chipping instruction)
- 5 cycling excursions (Road bikes included)
- Executive networking opportunities

September 26-28, 2016 Event

| Date | Start time | End time | Function | Location |
|---|---|---|---|---|
| Monday, Sept 26 | 3:30pm | 5:00pm | Cycling Welcome Ride | Entrance of The Lodge at Pebble Beach |
| | 6:00pm | 8:00pm | Welcome Reception | Library Room/Patio – The Lodge at Pebble Beach |
| | 8:00pm | 10:30pm | Dinner | The Tap Room: The Lodge at Pebble Beach |
| Tuesday, Sept 27 | 7:00am | 8:45am | Breakfast Buffet | Library Room – The Lodge at Pebble Beach |
| | 8:00am | 9:30am | Cycling: Coffee Ride | Entrance of The Lodge at Pebble Beach |
| | 9:00am | 11:15am | Golf Clinic with Laird Small | Golf Academy at Pebble Beach |
| | 10:00am | 2:00pm | Cycling: Endurance Ride (includes lunch) | Entrance of The Lodge at Pebble Beach |
| | 11:20am | 1:00pm | Tee off | Pebble Beach Golf Links |
| | 7:30pm | 8:30pm | Cocktail Reception | Library Room – The Lodge at Pebble Beach |
| | 8:30pm | 11:00pm | Executive Dinner | Library Room – The Lodge at Pebble Beach |
| Wednesday, September 28 | 6:15am | 8:15am | Tee off | Box Breakfast and golf at Spyglass Hill or Spanish Bay |
| | 7:00am | 8:30am | Cycling: Coffee Ride | Entrance of The Lodge at Pebble Beach |
| | 7:00am | 10:30am | Cycling: Endurance Ride (includes bunch) | Entrance of The Lodge at Pebble Beach |

126.    The deal registration officially closed on or about May 26, 2016. Adobe generated a net license revenue of $1,915,470.00 and paid Mirum[11] $150,000.00 for its "sourcing lead," "sourcing/qualifying," and "co-selling" involvement in the deal registration.

---

[11] Although both Mirum and JWT played significant roles in the deal registration process, Adobe only paid kickbacks to Mirum because JWT was not a business level partner.

*Adobe and "I3ICS" Deal Registration with the Army*

127.    In another deal registration that involved I3ISC and Mr. Oakley, the business

level partner requested an all expenses paid invite to Adobe's sales team annual kick-off event

held in Las Vegas, Nevada, in addition to $150,000.00, for influencing Annette Redmond,

Director of the Army Intelligence Community Information Management from October 2013 to

August 2017. Relator Evans sends Relator Dowless an email to that effect below:

**From:** Barbara Evans
**Sent:** Tuesday, October 4, 2016 4:27 PM
**To:** D. Alan Dowless ███████████████████ Wes Nagel ██████████████████
**Cc:** Mark Potenzone
**Subject:** RE: phil oakley

On with Phil we need it to go thru I3 and he wants to go to kickoff this year in Vegas
Thanks
Barb

| | |
|---|---|
| **From:** | D. Alan Dowless |
| **Sent:** | Tuesday, October 04, 2016 4:30 PM |
| **To:** | Barbara Evans |
| **Cc:** | Mark Potenzone; Wes Nagel |
| **Subject:** | RE: phil oakley |

OK, I'll update the record.  Tell Phil, I'll followup with him on this, he will be getting a deal registration invite and he
knows the drill from there.

I'll have to defer to Mark on the invite to sales kick off.

Alan



**D. Alan Dowless**          Mobile: ███████████          7930 Jones Branch Drive 5th floor
Senior Partner Sales Manager                                  McLean, VA, 22102, USA
Adobe Public Sector          ████████████          www.adobe.com

128.    As an initial matter, when Mr. Oakley first approached Ms. Redmond in October

2013, I3ICS was not a business level partner. Knowing that his company could receive kickback

payments and additional benefits from Adobe as a business level partner, at the time, he

specifically requested an unwarranted, "out-of-cycle" upgrade to business level.

129.     This deal had been initially registered to another partner. But as soon as Mr. Oakley approached the Adobe sales team indicating that he would work on successfully influencing Ms. Redmond, the "decision maker" of the Army, and demanded kickback payments and other non-financial incentives to that effect, Adobe replaced the partner with I3ICS for the deal registration.

130.     Upon information and belief, the deal with the Army closed on or about May 25, 2017. Carahsoft distributed via I3ICS and billed the Army, Adobe collected a net license revenue of $3,313,400.00 and also paid I3ICS $150,000.00 and flew Mr. Oakley to Las Vegas in or about December 2017.

B.   *Adobe Conspires with Emergent and CDW-G to Facilitate the Kickback Scheme*

131.     For the majority of the partners that participate in the SPP, particularly those named in this Amended Complaint, such as ClearInfo, I3ICS, RealEyes, and Mirum, Carahsoft is utilized as the master GSA Schedule holder for Adobe software solutions.

132.     Some partners are resellers that also have privity of contract with the government. This means that companies like Emergent and CDW-G are GSA Schedule holders and are equally capable of directly distributing and billing government entities for Adobe products and services. However, this does not preclude Emergent and CDW-G (or other partners obtaining GSA Schedules) from using Carahsoft as an agent or teaming partner.

133.     For fiscal years 2015 and 2016, Emergent was one of the biggest collector of kickbacks totaling $1,271,040.26. Relator provides a spreadsheet[12] that shows the total pay-out amounts:

---

[12] Information provided in this spreadsheet is obtained from a weekly report that shows all business deals that were closed under the SPP. Adobe headquarters compiled and distributed the report to a platform (SalesForce.com) only accessible by sales team personnel. Since Relator Dowless no longer has access to

| Partner | Sum of Deal Value | Sum of Payout w/Cap |
|---|---|---|
| ⊞ Bates Creative | $150,000.00 | $22,500.00 |
| ⊞ CACI Intl | $857,250.00 | $42,862.50 |
| ⊞ Casa (Direct.com LLC DBA Agencia Casa) | $75,000.00 | $3,750.00 |
| ⊞ CDW | $780,444.67 | $39,022.23 |
| ⊞ ClearInfo | $2,806,656.58 | $208,006.53 |
| ⊞ CommunityForce Inc. | $328,686.00 | $0.00 |
| ⊞ Deloitte Consulting | $2,472,021.69 | $0.00 |
| ⊞ Discover Technologies | $134,610.00 | $0.00 |
| ⊞ DMI Grants .gov | $412,726.56 | $61,908.98 |
| ⊞ EMERGENT, LLC | $15,262,159.09 | $1,271,040.26 |
| ⊞ Four Point Solutions LTD (North America) | $808,493.39 | $121,274.01 |
| ⊞ GovConnection | $96,762.00 | $4,838.10 |
| ⊞ Government Acquisitions | $408,885.00 | $20,444.25 |
| ⊞ GuidePoint Security | $1,057,550.48 | $131,928.39 |
| ⊞ Holman's USA LLC | $941,838.00 | $141,275.70 |
| ⊞ i3 Integrative Creative Solutions | $767,043.40 | $115,056.51 |
| ⊞ ICF Interactive | $269,200.20 | $40,380.03 |
| ⊞ Information Analysis, Inc. | $4,552,852.23 | $471,636.60 |
| ⊞ InfoTek Corporation | $420,750.00 | $0.00 |
| ⊞ INSIGHT DIRECT USA | $199,842.03 | $9,992.10 |
| ⊞ Intelligent Decisions | $362,394.00 | $18,119.70 |
| ⊞ Lima Consulting Group | $734,400.00 | $36,720.00 |
| ⊞ Mackson Consulting, LLC | $1,655,279.66 | $181,896.95 |
| ⊞ Managing Editor Inc. | $58,500.00 | $8,775.00 |
| ⊞ Mirum | $1,915,470.00 | $150,000.00 |
| ⊞ Modern World Technology, LLC. | $631,475.85 | $94,721.38 |
| ⊞ MRM//McCann (was McCann Relationship Marketing, Inc., dba MRM) | $1,920,636.00 | $205,119.15 |
| ⊞ NewStreet Global Solutions LLC | $11,877,205.00 | $450,000.00 |
| ⊞ nizdesigns | $789,165.00 | $39,458.25 |
| ⊞ Plurality Solutions | $348,205.77 | $28,066.79 |
| ⊞ Quest Consultants LLC DBA Aerstone | $2,643,270.00 | $64,514.50 |
| ⊞ RealEyes | $6,527,576.50 | $346,388.03 |
| ⊞ Syntasa (formerly ABSi) | $3,055,000.68 | $220,875.00 |
| ⊞ Triad Technology Partners LLC | $422,250.00 | $0.00 |
| | | |
| ⊞ Twin Technologies, LLC | $8,121,003.87 | $150,000.00 |
| ⊞ VML, Inc | $142,560.00 | $21,384.00 |
| Grand Total | $74,007,163.64 | $4,721,954.93 |

134.    Moreover, both Emergent and CDW-G also gained an upfront profit margin by obtaining access to a discounted rate for Adobe products and services, which enabled them to sell to the government for a substantially higher price.

---

the weekly reports posted on SalesForce, he provides this spreadsheet created at the time of his employment, containing an extract of the information provided in the weekly report.

135.     Therefore, not only did Emergent and CDW-G obtain illegal remuneration from Adobe in exchange for securing government contracts but also received sales profit at the outset, which encouraged them to sell Adobe products and services over competitive products. Neither Adobe, Emergent, nor CDW-G disclosed such a factor to any government customer.

C.  _Adobe Enforces Corporate Directives, Pressuring its Sales Teams to Facilitate the Kickback Scheme_

136.     Adobe demonstrates fraudulent corporate intent through a variety of methods, instructing its sales team to follow corporate policies that require fraud and pressuring its sales managers to encourage all partners to obtain business level status so that they become eligible for kickbacks. In some cases, Adobe provided unwarranted and unearned business level status outside of stated SPP guidelines to partners that could close a high-value deal.

137.     The fraud committed under the SPP are corporate directives from the Adobe Partner Sales Organization, exercised through verbal and written instructions to pay kickbacks, track deal registrations to ensure that partners are rewarded, and encourage partners to obtain business level status, so that more business level partners are eligible for kickback payments.

138.     Corporate policies and procedures at Adobe to operate the SPP are not a reflection of what is fair and reasonable contract pricing for government customers. In fact, the Adobe sales team is under enormous corporate pressure to secure, track, and close as many federal deal opportunities as they possibly can, by tendering kickbacks to its business level partners. While Relator Dowless was employed with Adobe, the Adobe sales team approached Relator Dowless frequently to sign up partners for kickbacks, in order to secure federal deal bookings.

139.     Revealing fraudulent intent and that these practices are indeed conducted on a company-wide scale, corporate policy is constantly reinforced at Adobe in various ways.

52

140.     Subject to unnecessary and unreasonable pressure to increase revenue of Adobe software solutions to government customers, first, sales managers attentively monitor and track the level of partner involvement at every stage of deal registration. The internal procedure not only ensures that kickbacks are direct deposited to partners' bank accounts, but it also makes certain that sales managers are up to speed with all aspects of the deal registration.

141.     For example, *supra* at 31-34, when partners believed that they deserved a higher kickback than already paid, Relator Dowless worked with them to handle matters pertinent to the deal registration and ensured that each partner was essentially given "undivided attention" for such matters.

142.     Moreover, to keep its partners motivated, much of the role of the Adobe sales manager is to make sure that all kickbacks are paid to the appropriate partner in a timely manner.

143.     Second, Adobe also instructs sales managers to encourage community level partners to reach the business level so that more partners are paid incentives to engage in "sourcing," "qualifying" and/or "co-selling."

144.     Adobe provides a document entitled "Business Level Contractual Onboarding," which outlines the 12 steps required for a community level partner to achieve business level status:

### Business Level Contractual Onboarding

| Step | Description | Responsible for completion |
|---|---|---|
| 1 | SPP APEX Registration – "Join Program" link per next slide | Partner |
| 2 | Business Plan Creation – PSM works with Partner on this | PSM |
| 3 | Business Plan Approval – PSM Manager and/or Bill McCulloch | PSM |
| 4 | Contracts and Forms to Partner – MPA, DRA, VMI (& W-9 if US) | SPP Admin or Assc Prgm Mgr |
| 5 | Partner Signs and Returns Contracts – ECM or email | Partner |
| 6 | Partner Completes and Returns Forms – VMI & W-9 by email | Partner |
| 7 | Adobe Executes Contracts – Contract Coordinators in IE and US | SPP Admin or Assc Prgm Mgr |
| 8 | Adobe Finalizes VMI – AP Team if US, VMG Team if outside US | SPP Admin or Assc Prgm Mgr |
| 9 | APEX Account Uplevel - Moving from Comm. Level to Business | SPP Admin or Assc Prgm Mgr |
| 10 | Business Level Welcome Email is sent *Partner is now Onboarded!* | spphelp@adobe.com |
| 11 | Deal Registration Training – Group training or individualized | partnersalesops@adobe.com |
| 12 | First Deal Registered – Approved DR opportunity record | Partner |

145.    However, Adobe frequently pre-approves community level partners before all of the requirements are completed and upgrades partners to business level status, fast-tracking partners toward kickbacks. For example, prior to attaining business level, a partner is required to influence $1-2 million in deal bookings. Adobe frequently provided business level status to partners that did not fulfill the requirement if the partner promised to influence a high-value deal.

146.    The pre-approval process asks potential business level partners to sign a contract with Adobe, essentially agreeing to accept kickback payments. Relator Dowless provides a portion of the contract entitled "Master Partner Agreement," below:



**MASTER PARTNER AGREEMENT**

Effective Date: date of last signature ("**Effective Date**")

### PARTIES

(1) **Adobe Systems Incorporated**, a company incorporated in Delaware, U.S.A., having a place of business at 345 Park Avenue, San Jose, California 95110-2704, U.S.A. ("**Adobe US**").

(2) **Adobe Systems Software Ireland Limited**, a company incorporated in Ireland, having a place of business at 4-6 Riverwalk, City West Business Campus, Saggart D24, Dublin, Ireland ("**Adobe Ireland**").

Adobe US and Adobe Ireland are collectively referred to as "**Adobe**".

(3) _____(ABN/Company Registration No. _____, if Partner Location is Australia)_, a company incorporated in _____ ("**Partner Location**"), having a place of business at _____ ("**Partner**").

### RECITALS

1. Adobe is a software company that develops and markets software products and services and provides related professional services. Adobe US is the licensor of all Adobe products and services in the United States, Canada and Mexico; and Adobe Ireland is the licensor of all Adobe products and services in all other countries in the world.

2. Partner is a firm that may provide:

   (A) Partner's consulting and other technology-related products and services (collectively referred to as "**Partner Products and Services**") to Partner's customers; or

   (B) Adobe Products and Services to Partner's customers under an addendum to this Agreement.

3. Partner wishes to participate in an Adobe partner program as mutually agreed between the parties, including but not limited to the Adobe Solution Partner Program, and successors thereto ("**Partner Program**"), in accordance with the terms and conditions of this Agreement.

147. Adobe also asks potential business level partners to fill out a form entitled "Vendor Master Information," which asks for bank account information so Adobe can easily direct deposit kickback payments:

**VMI** - VENDOR MASTER INFORMATION

Required Fields Denoted By *

**NORTH AMERICA** VENDOR QUESTIONNAIRE

* ○ NEW VENDOR (Complete both pages)
  ○ DATA CHANGE

Vendor # (Required if Data Change)

**COMPANY INFORMATION:  Corporate Address and/or Remit Address**

Company Name *

Remit Company Name (if different)

Street Address *

Remit Street Address (if different)

City *

State *

Remit City (if different)

Remit State (if different)

Country *

Zip/Postal Code *

Remit Country

Remit Zip/Postal Code

Accounting Contact Name *

Accounting E-mail *

Phone Number *

Fax Number

Purchase Order Recipient Name

Purchase Order Recipient E-mail

US VENDORS MUST COMPLETE THIS SECTION.  A SIGNED W-9 FORM MUST BE PROVIDED.  W9 Must Be 2013 Version or Newer

EIN:

SSN:

MWBE Classification
○ Woman Owned   ○ Minority Owned   ○ Small Business   ○ Disabled Veteran
○ Other

**BANK INFORMATION** - For banks in the US an ABA # or ACH Routing # is required.

Bank Name *

Bank City *

Bank State *

Bank Country*

Bank Address

Bank Branch Name

Account Name (if different than Company Name)

ABA or ACH Routing # *

Bank Account Number *

Bank and Transit Code (For banks in Canada only)

148. Third, once a partner achieves business level status and engages in the deal registration process, Adobe asks partners to nominate themselves under three categories of sales influence – "sourcing," "qualifying," and "co-selling" – described in detail *supra* at 22-23.

149. Typically, Adobe evaluates the nomination and decides whether to accept the deal registration and pay the business level partner a percentage of the deal value as a financial incentive to its involvement.

150. However, in over 75% of instances, Adobe instructs sales managers in charge of accounts to complete the nomination process on behalf of the business level partners.

151. For example, Relator Dowless simply completed the nomination process for a number of business level partners in order to avoid the possibility that the partner would complete the nomination with error or inadvertently forget to submit the nomination altogether.

56

152.     In summary, all of these various methods to systematically induce its fraudulent scheme, intent, and conduct per corporate, also serve to continue the fraud and have served to keep detection at bay, until now.

153.     In addition, the ongoing kickback scheme occurring at Adobe caused Carahsoft, Emergent, and CDW-G to submit false reports, statements, and claims. As a result, federal agencies have already made numerous fraudulently induced payments and continue to be wrongly responsible for an unreasonable amount of payments.

154.     There have been instances in which a business level partner refused (or tried to refuse) to accept kickbacks from Adobe, expressing fear that it could be subject to violations of the AKA and the FCA.

155.     As a representative example, having faced similar lawsuits[13] before, Accenture refused to accept kickbacks from Adobe. As a result of the 2011 Department of Justice settlement, Accenture was fully aware of the hazards of receiving kickbacks in connection to influencing government contracts. To that effect, Accenture repeatedly told Adobe sales managers that the incentives provided under Adobe's SPP were prohibited kickbacks.

156.     Despite knowing that Accenture did not want to participate in the kickback scheme, Adobe was persistent.

157.     After numerous failed attempts to pay kickbacks to Accenture, Adobe finally re-directed kickback payments into a joint marketing fund to provide sales and training events for the Adobe sales team and Accenture. The email chain between Relator Dowless and other Adobe sales team members on this account, indicating Accenture's refusal to accept kickbacks under the SPP and the existence of the joint marketing fund, is provided below:

---

[13] Accenture settled a FCA lawsuit on the same type of kickback claim in or about 2011. *See* Compl. of *United States ex rel. Rille v. Accenture LLP*, 4:04-cv-00985-BRW (E.D. Ark. 2007).

From: D. Alan Dowless
Sent: Friday, April 29, 2016 11:42 AM
To: Robin Hewitt ████████████
Subject: SAFCIO ELS - Accenture

Hi Robin, just an FYI on these two oppty with Accenture attribution

https://protect-us.mimecast.com/s/wXYXBoFkVE0uY?domain=adobe.my.salesforce.com
https://protect-us.mimecast.com/s/ar9rBwS0gGeUx?domain=adobe.my.salesforce.com

We are working with Accenture, SecurAuth and Adobe as a team on the Plugfest demo.  The demo is
based on a real-world scenario at AF ELS, where Accenture has a current contract and need for DRM.

Let me know if you have a moment to discuss so I can fill in the details.

Thanks,
Alan


D. Alan Dowless
Mobile: ████████████
7930 Jones Branch Drive 5th floor
Senior Partner Sales Manager

From: Robin Hewitt
Sent: Monday, May 9, 2016 12:38 PM
To: D. Alan Dowless ████████████████
Cc: Lisa Sonek ████████████████
Subject: RE: SAFCIO ELS - Accenture

This is great. Who is the main POC at Accenture driving these? Let us know if you need anything. Thank
you

Robin L Hewitt | Global Alliance Director, Accenture | Adobe Systems | ██████████ m | ██████████ o |
████████████


From: D. Alan Dowless
Sent: Friday, June 03, 2016 10:53 AM
To: Robin Hewitt ████████████████
Cc: Lisa Sonek ████████
Subject: RE: SAFCIO ELS - Accenture

Hello Robin and Lisa,

We are working with the person below at Accenture for the Air Force ELS contract, see NDA attached.

Rudy Rihani
████████████

We need some assistance and would like to brief you on where we stand on this oppty with Accenture
Federal.  I◆d like to setup a call with the acct team for late next week to brief you and get your advice.

BTW, is my understanding correct that Accenture does NOT accept deal registration payments and that
those funds are deposited into an Adobe marketing development fund for future marketing events with
Accenture◆.is this correct?

What is your availability for late next week ◆ wed to fri.

Thanks,
Alan

```
From:    Lisa Sonek
Sent:    Friday, June 03, 2016 12:58 PM
To:      D. Alan Dowless; Robin Hewitt
Subject:       RE: SAFCIO ELS - Accenture

Hi Alan ◆ you can hit my calendar; Robin is traveling next week so she◆ll need to let you know what works
best for her.

I don◆t believe Accenture can accept deal reg on any Federal gov◆t deals . However, the deal registration
process has changed with the new CMF program. With Adobe◆s new CMF program, Accenture automatically
gets deal reg when they are attributed in Salesforce and the deal closes◆Funds go into a central marketing
fund. The beauty now is that the process is just tied to attribution.

Bottom line ◆ attribution is the most important aspect; which you◆ve already done (thank you).

Lisa Sonek | Sr. Global Alliance Manager | Covering Accenture North America | ███████ office |
███ mobile | ██████████
```



158.    Upon information and belief, the amount charged to the federal government as a result of the kickback scheme is actually much higher than it would otherwise be to account for the cost of the kickbacks. Even though a handful of business level partners like Accenture refuse to engage in fraud, with corporate and Adobe sales managers having a hand in each deal registration, fraud is evident in close to 100% of deal registrations.

D.    *Adobe Pays Illegal Kickbacks to Transact Sales With the State and Local Government*

159.    Adobe's fraudulent kickback scheme not only occurs against federal government customers but also for state and local government agencies.

160.    Adobe operates state and local deal registrations under the same SPP in order to encourage participants to assist and influence the sale of Adobe software solutions to state and local government customers.

161.    As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a particular government agency over competing software solution companies exists here.

162.    In summary, by virtue of registering deals under the SPP, a partner is paid an unlawful kickback for doing business with state and local government customers, wrongfully inducing the government to purchase Adobe licenses.

59

163.     Financial figures from fiscal years 2015 and 2016, obtained from a weekly report compiled and distributed to sales teams by Adobe's headquarters indicates the massive amounts of revenue that Adobe accrued from state and local government agencies as a result of its kickback scheme.

164.     Similar to the spreadsheets compiled by Relator Dowless *supra* at 26-30, Relator Dowless provides a spreadsheet with information obtained from a weekly report that shows all business deals that were closed under the SPP, including federal deals and state and local deals. Adobe headquarters compiled and distributed the comprehensive report to a platform (SalesForce.com) only accessible by sales team personnel.

165.     In fiscal year 2015, Adobe paid at least $1,218,775.55 in kickback payments. Such kickbacks fraudulently induced state and local governments to spend at least $15,927,796.93 – a significant amount that would not have been paid for, had these agencies known about Adobe's fraud. Relator provides a spreadsheet below showing some of the Deal Registrations from fiscal year 2015:

| Sourcing Partner: Account Name | Selling Partner: Account Name | Net Revenue | Percent | Total | Payout |
|---|---|---|---|---|---|
| Four Point Solutions LTD (North America) | (blank) | $313,249 | 10.00% | $31,324.90 | $31,324.90 |
| Matrix Systems Group, Inc. | Matrix Systems Group, Inc. | $95,226 | 15.00% | $14,283.90 | $14,283.90 |
| (blank) | Taborda Solutions, Inc. (Formerly Finish Line Solutions) | $125,843 | 5.00% | $6,292.14 | $6,292.14 |
| Hewlett Packard Company | Hewlett Packard Company | $1,136,723 | 15.00% | $170,508.38 | $150,000.00 |
| (blank) | Taborda Solutions, Inc. (Formerly Finish Line Solutions) | $371,400 | 5.00% | $18,570.00 | $18,570.00 |
| (blank) | Taborda Solutions, Inc. (Formerly Finish Line Solutions) | $552,000 | 5.00% | $27,600.00 | $27,600.00 |
| Taborda Solutions, Inc. (Formerly Finish Line | Taborda Solutions, Inc. (Formerly Finish Line Solutions) | $585,000 | 15.00% | $87,750.00 | $87,750.00 |
| (blank) | Taborda Solutions, Inc. (Formerly Finish Line Solutions) | $555,000 | 5.00% | $27,750.01 | $27,750.01 |
| (blank) | Accenture PLC | $656,998 | 5.00% | $32,849.88 | $0.00 |
| Taborda Solutions, Inc. (Formerly Finish Line | Taborda Solutions, Inc. (Formerly Finish Line Solutions) | $264,000 | 15.00% | $39,600.00 | $39,600.00 |
| Source360 Group | Source360 Group | $225,489 | 15.00% | $33,823.35 | $33,823.35 |
| Source360 Group | Source360 Group | $346,000 | 15.00% | $51,900.00 | $51,900.00 |
| Source360 Group | Source360 Group | $163,001 | 15.00% | $24,450.15 | $24,450.15 |
| Source360 Group | Source360 Group | $296,496 | 15.00% | $44,474.40 | $44,474.40 |

166.     Here, the embedded portion of the spreadsheet above identifies the "sourcing" partner and "selling" partner, the value of the deal, and the incentive percentage paid to each

business level partner. Notably, the chart indicates that Accenture continued to refuse kickback payments under state and local deal registrations.

167.    Another portion of the same spreadsheet (below) identifies the state and local government entity that purchased Adobe licenses and the sales opportunity named for the specific government business transactions:

| Account Name: Account Name | Opportunity Name | Record Type |
|---|---|---|
| State of Minnesota Department of Revenue | MN Department of Revenue AEM | DR |
| Lake County, Illinois | AEM Lake County Circuit Court | DR |
| Wisconsin Department of Natural Resources | ADM-Wisconsin Dept. of Natural Resources-AEM Forms | DR |
| State of California Department of Corrections & Rehabili | CDCR Forms & DRM conversion | DR |
| County of San Diego Superior Court of California | SD Courts Conversion | DR |
| State of California Department of Motor Vehicles (DMV) | DMV AEM Forms Conversion | DR |
| California Highway Patrol (CHP) | CHP AEM Conversion | DR |
| State of California Department of Child Support Services | DCSS AEM Forms Conversion | DR |
| State of California Health Benefit Exchange | Covered California AEM 6.0 Conversion | DR |
| California Department of Public Health (CDPH) | CDPH - AEM Forms | DR |
| State of Arkansas Department of Workforce Services | ADWS - AEM Forms - JDM | DR |
| City of Dallas | City of Dallas - AEM Forms 2015 - Misch | DR |
| State of Texas General Land Office | TX GLO 2015 AEM Forms | DR |
| State of Texas Department of Transportation | TX DOT AEM 2015 | DR |

168.    Similarly, the following year, a total amount exceeding $1,675,820.49 accounts for kickback payments during fiscal year 2016. Such kickbacks fraudulently induced the government to spend at least $21,935,769.56 – another substantial dollar figure that would not have been paid for, had the government known about the kickback scheme. Relator provides a spreadsheet below showing some of the Deal Registrations from fiscal year 2016:

| Sourcing Partner: Account Name | Selling Partner: Account Name | M1 | EST Net Revenu | Percent | Total | Payout |
|---|---|---|---|---|---|---|
| Four Point Solutions LTD (North America) | Four Point Solutions LTD (North America) | $44,800 | $134,400.00 | 15.00% | $20,160.00 | $20,160.00 |
| Matrix Systems Group, Inc. | Matrix Systems Group, Inc. | $70,000 | $210,000.00 | 15.00% | $31,500.00 | $31,500.00 |
| Matrix Systems Group, Inc. | Matrix Systems Group, Inc. | $58,724 | $176,172.00 | 15.00% | $26,425.80 | $26,425.80 |
| Matrix Systems Group, Inc. | Matrix Systems Group, Inc. | $109,720 | $329,160.00 | 15.00% | $49,374.00 | $49,374.00 |
| Matrix Systems Group, Inc. | Matrix Systems Group, Inc. | $36,000 | $108,000.00 | 15.00% | $16,200.00 | $16,200.00 |
| Taborda Solutions, Inc. (Formerly Finish Li | Taborda Solutions, Inc. (Formerly Finish Lin | $90,750 | $272,250.00 | 15.00% | $40,837.50 | $40,837.50 |
| (blank) | INSIGHT DIRECT USA | $23,732 | $71,196.69 | 5.00% | $3,559.83 | $3,559.83 |
| (blank) | En Pointe Technologies Sales LLC | $10,888 | $32,664.00 | 5.00% | $1,633.20 | $1,633.20 |
| Hewlett Packard Enterprise Company | Hewlett Packard Enterprise Company | $555,807 | $1,667,421.00 | 15.00% | $250,113.15 | $150,000.00 |
| IMP Solutions Group | IMP Solutions Group | $466,000 | $1,398,000.00 | 15.00% | $209,700.00 | $150,000.00 |
| Allied Network Solutions | Allied Network Solutions | $72,600 | $217,800.00 | 15.00% | $32,670.00 | $32,670.00 |
| Aslan Consulting | Aslan Consulting | $229,944 | $689,832.80 | 15.00% | $103,474.92 | $103,474.92 |

61

169.    Another portion of the same spreadsheet (below) identifies the government entity
that purchased Adobe licenses and the sales opportunity named for the specific government
business transactions:

| Account Name: Account Name | | Opportunity Name | |
|---|---|---|---|
| Alabama State Department of Education | | Alabama State Department of Education - |
| State of Illinois Kane County Circuit Clerk | | AEM Kane County, IL |
| State of Minnesota - County of Hennepin | | Hennepin County AEM Forms |
| City of Chicago | | AEM City of Chicago |
| City of Chicago Police Department | | Chicago Police Dept AEM |
| State of Minnesota Courts | | MN Courts AEM |
| State of Iowa Department of Human Services | | Brooks / Iowa / Iowa DHS / AEM Forms Flip |
| State Of Nebraska Department of Environmental Quality (NDEQ) | | Brooks / Nebraska / AEM Forms Flip Conve |
| State of California Department of Corrections & Rehabilitation (CDCR) | | CDCR HPE ERMS AEM Forms |
| Department of Transportation (Caltrans) | | Caltrans AEM Forms Conversion |
| County of Sacramento | | Sac County Sherriff Forms |
| Hawaii Department of Human Services | | HI-DHS-eForms |

170.    This list shows only a representative portion of impacted states and local counties.
Over the course of the two years, Adobe's kickback scheme encompassed numerous states. Thus,
nearly all of the affected states are accounted for in Counts 7-19.

171.    Since Relator Dowless no longer has access to the weekly reports posted on
SalesForce, he provides the spreadsheet created at the time of his employment, which contains
the information provided in the weekly report.

172.    This chart is *key* to confirming that the kickback scheme was widespread
throughout the Adobe partner sales organization, encompassing federal, state and local
government customers.

173.    In summary, Adobe offers illegal kickbacks to its partners in order to fraudulently
induce state and local government agencies to procure Adobe software solutions. This kickback
scheme causes state and local government customers to pay for claims submitted under its
contract with Carahsoft, which carries Adobe products and services. In addition, by offering

illegal remuneration to its partners under the SPP, Adobe also causes the creation and submission of false and fraudulent records, statements, and claims to state and local agencies.

**_Submission of False Claims, Records, and Statements_**

174.    Adobe also routinely violates the FCA by falsely and fraudulently representing the quantity and type of Adobe software solutions that the government should actually be purchasing. In doing so, Adobe causes the submission of false claims, all of which are grossly inflated. Such fraud is perpetrated in the following ways:

A.    _Adobe Causes Carahsoft To Improperly Bill The Government For Inflated Annual Term Fees On Personal Licenses_

175.    Adobe engages in an intentional fraudulent scheme to misrepresent Adobe Buying Programs, forcing Adobe sales managers to record inaccurate invoices for software licenses used by government employees at home, and thus, causing Carahsoft to overcharge the government for payment.

176.    As an initial matter, Adobe Buying Programs are purportedly dedicated to providing government agencies with "cost-effective options and control they need to put the right Adobe in the hands of the right employees." *See* Adobe Buying Programs website available at https://www.adobe.com/howtobuy/buying-programs/government.html.

177.    Specifically, the Adobe Enterprise License Agreement ("ETLA") is a buying program designed to supposedly "meet the needs of large agencies and organizations," providing "budget predictability over a three-year term – with *one annual payment due* on the same date each year." *Id* (emphasis added).

178.    In addition, the ETLA is supposed to offer scalable purchasing options that simplify license management and provide budget predictability, which includes the following:

**Enterprise Term License Agreement (ETLA)**

3-year term with a set annual payment date

Named-user licensing through the Admin Console

Serialized deployment through the Adobe Licensing Website (LWS)

Includes Creative Cloud for enterprise, Adobe Document Cloud for enterprise and more

179.    Through its contract with Carahsoft, the government agency purchasing the ETLA from Adobe pays a set annual fee for a three-year term license. No additional payments should be made and nothing higher than the pre-negotiated annual fee should be paid for the ETLA, until expiration of the three-year term and the license is up for renewal and/or until each annual payment is due during the three-year term.

180.    However, Adobe engages in a conspiracy with Carahsoft to successfully generate additional revenue from these ETLA contracts through the Adobe Home Program ("Home Program.")

181.    Typically, most Adobe Buying Programs allow government employees to purchase the same Adobe software available at work for installation on home computers at almost 25% off the retail price. Government employees who purchase Adobe software for home use are entitled to the software for personal use and non-work related tasks.

182.    Accordingly, through the Home Program, government employees purchase Adobe software as a personal license subscription ("personal license"). *See e.g.* Carahsoft DHS Product

Catalogue website available at

http://www.afgelocal1240.org/old/frames/frame_homeuseprogramsadobe.html.

183.    There are a number of problems with the way the Home Program is operated, all of which allows Adobe to easily bypass legal operations.

184.    First, the purchasing government employee is the only one responsible for paying for the personal use software at the discounted price. However, after the initial personal use transaction, regardless of whether the first year was properly paid for by the government employee, the personal license is not individually tracked. Instead, it is intentionally swept into a pool of licenses that are tracked as government owned licenses under the original ETLA provided by Carahsoft and Adobe.

185.    In other words, Adobe intentionally includes personal licenses in the total number of licenses provided under the ETLA and presents a bill based on the total count of licenses provided, failing to segregate between those purchased for personal use and government use.

186.    Carahsoft facilitates the fraud by invoicing the government with the annual fees for all licenses even though the government has no obligation to pay for personal licenses.

187.    Such a scheme is possible because although the government purchase under the ETLA contract and the individual government employee purchases are treated as separate transactions, Adobe offers only one software license key for downloading Adobe products under each ETLA contract, regardless of whether the purchase is for the entire government agency or for personal use. There is no way for the government agency to know whether each annual term fee (and/or renewal fee) is with or without the inclusion of personal licenses.

188.    In fact, when it comes times to bill the government for an annual term fee or renewal fee, Carahsoft does not bill the government agency with *x* number of Adobe licenses

purchased that year but a simple invoice with the charges. The government agency relies on Carahsoft's representations and assumes the billing is accurate.

189.    Thus, by deliberately failing to distinguish between the government agency's license purchases and the government employee's personal license purchases, Adobe causes Carahsoft to bill the government for personal licenses, which fraudulently increases the annual term fees and and/or renewal fees paid for by the government.

190.    Second, by operating this fraud scheme, not only does Adobe cause Carahsoft to improperly bill for current government employees but also former government employees, who at some point during employment purchased personal licenses.

191.    In other words, Adobe and Carahsoft continue to receive payment for licenses that belong to employees that have left government service.

192.    Since Adobe offers one software license key for downloading Adobe products under each ETLA contract, Adobe prevents the government from knowing whether each annual term fee (and/or renewal fee) is with or without the inclusion of personal license purchases, let alone whether the personal license is for a current government employee or for one that has long left the agency.

193.    As a result, Adobe causes Carahsoft to continue to bill the government for personal licenses purchased by former employees, which continues to increase the annual term fees and and/or renewal fees paid for by the government. Had the government known of this fraud, it would never have made payments.

194.    In sum, by instructing Adobe sales managers to falsify invoices, Adobe manipulates claims submitted by Carahsoft, ensuring that nearly every personal license

subscription purchased by a current or former government employee is reflected in annual term fees and renewal fees billed for under the ETLA contract.

195.     Relator Whalen provides a representative example of this fraud below.

**_ETLA Contract with Department of Homeland Security_**

196.     By way of example, in or about 2014, Department of Homeland Security ("DHS") agreed to contract with Carahsoft for access to Adobe software licenses, maintenance, training, and consulting services. This account was managed by Laura Rich, Adobe District Manager, Digital Media Public Sector.

197.     Under the Adobe Department of Homeland Security Blanket Purchase Agreement, DHS purchased an ETLA for Adobe products through Carahsoft.

198.     Among other things in the contract, Ms. Rich allowed DHS employees, access to the DHS Home Use Program, permitting employees to purchase any and all Adobe Digital Media products available on the ETLA contract for home use. Relator Whalen provides a sample of the Adobe DHS Blanket Purchase Agreement below, which shows the Home Use eligibility provision:

**Carahsoft / Adobe**
**Department of Homeland Security Resources**

**BPA Overview**



199.     Abusing its procurement relationship with DHS, Adobe and Carahsoft conspired to effectuate the improper billing scheme by intentionally failing to segregate personal license subscriptions from licenses directly purchased by DHS under its ETLA contract.

200.     Adobe tracked personal licenses subscriptions to ensure that those purchases were included in the claims for annual term fees that Carahsoft submitted to the DHS for payment.

201.     As a result of the fraud, both Adobe and Carahsoft generated additional revenue from sales of personal license subscriptions, at the front-end from the DHS employee purchasing the discounted software, and at the back-end from DHS, unknowingly paying for licenses it had no obligation to pay.

202.     Adobe and Carahsoft also continued to collect payments for personal license subscriptions purchased by former employees causing DHS to make ongoing payments for personal licenses that were not being used by current DHS employees. In fact, Relator Whalen had personal exposure to invoices that charged DHS annual license fees for at least 187,000 Adobe software personal licenses, despite the fact that DHS employed approximately 140,000 full-time employees at the time.

203.     On more than one occasion, Relator Whalen expressed her concerns to upper management regarding the wrongful profiting off of personal license subscription sales to DHS employees. Her concerns were dismissed every time.

204.     Instead, Adobe continued to encourage the fraud by offering high commissions, bonuses, and other performance incentives for Adobe sales managers and account managers that contributed or participated in facilitating the fraud and generating revenue from DHS.

205.     The DHS-ETLA contract example is a potent illustration of Adobe and Carahsoft's intent to completely disregard the purpose of government procurement rules and regulations and the provisions under the FCA to maximize dollars for the company.

B.  *Adobe Causes Carahsoft and CDW-G To Fraudulently Induce The Government To Purchase Unnecessary Software Licenses*

206.    Adobe also causes the submission of false claims, reports, and statements by conspiring with Carahsoft and CDW-G to fraudulently induce government customers under the ETLA to procure additional Adobe software licenses when they only wanted Acrobat. As a result, Carahsoft and CDW-G bills for software licenses included in the Adobe Creative Suite that the government agency neither needs nor requests. In fact, in order to promote the sale of the Suite, Adobe exploits the opportunity to sell unnecessary quantities and types of additional software licenses when the government agency only asked for Acrobat.

207.    Specifically, during Relator Evans' employment at Adobe, nearly every time a government customer asked if Acrobat was included in the Suite, Adobe sales managers and account managers were instructed by corporate to say that the Acrobat version offered in the Suite was only a "run-time" iteration and not a complete version of Acrobat, thus, inducing the purchase of both the Suite and Acrobat.

208.    That was a lie. The Suite offers a complete version of Acrobat and there is no need for the purchase of both the package and the standalone license. There is no functional difference between the versions.

209.    Adobe takes advantage of the agencies' reliance on its expertise to recommend and suggest certain products. Moreover, Carahsoft and CDW-G directly improperly bill agencies for payment, also taking advantage of agencies' reliance on Carahsoft and CDW-G to submit accurate claims, reports, and statements on behalf of Adobe.

210.    Adobe has clear financial intent and motive to increase revenue by fraudulently inducing government customers to purchase the Suite for various reasons. For one, the procurement price for the Suite is substantially higher than the price for just the Acrobat. Moreover, Adobe sales management are concerned with devolving into a single product software

solution provider for government agencies. Adobe believes that its success with selling massive packages like the Suite makes it more marketable for prospective clients and investors.

211.    Specifically, Adobe caused submissions for false claims, reports, and statements to government agencies under the ETLA contract, which provides the government with access to Adobe software solutions. A procurement transaction under the ETLA contract involves Carahsoft as the distributor and CDW-G as the prime vendor, providing Adobe products and services to government customers.

212.    The fraud was common practice peddled by Adobe, Carahsoft, and CDW-G. As a result, government agencies were fraudulently induced to make a double purchase of the Acrobat license.

213.    Relator Evans provides examples illustrating the double purchase under different ETLA contracts between the Navy and Carahsoft in both 2014 and 2015:

**Contract #1 (September 12, 2014)**

September 12, 2014

Craig Abod
Carahsoft Technology Corp
12369 Sunrise Valley Drive, D-2
Reston, Virginia  20191

Re:    Additional Discount for United States Navy Engineering Logistics Office

Dear Craig Abod:

The parties are entering into a transaction ("Agreement") whereby Adobe Systems Incorporated ("Adobe") will provide certain Adobe software products ("Licensed Products") on a term basis and associated support services ("Support") to Carahsoft Technology Corp. ("Carahsoft") for distribution through Force 3 ("Reseller") to United States Navy Engineering Logistics Office ("Customer") and is hereby authorized by Adobe to fall under the Adobe Partner Connection Distribution Agreement (Ref# 289840 as amended by Ref # 405489) between Adobe and Carahsoft.  The Effective Date is defined in Attachment A. Adobe hereby provides Carahsoft the following discounted prices for an enterprise term license agreement sales opportunity (the "ETLA Sales Opportunity"):

A.    ETLA Sales Opportunity

The ETLA Sales Opportunity shall consist of an initial purchase and, if applicable, subsequent "true-up" term licenses as identified below in accordance with special pricing and terms of a three (3) year Enterprise Term License Agreement set forth in Attachment A hereto (the "ETLA").

**Pricing for Year One, Two & Three Annual Installments and for Additional Deployments:**

| SKU | Description | Estimated QTY | Extended Price to Carahsoft | |
|---|---|---|---|---|
| | | | Unit Price | Total |
| | | | 1 Yr. Subscription Pricing | |
| | *SUBSCRIPTION* | | | |
| 65227934JA | Acrobat Professional 0 MLP Term w Maint & Gold Multi NorthAmerican Language | 400 | 108.00 | 43,200.00 |
| 65227749JA | Creative Cloud ENT 0 MLP SW Subscription Only Multi NorthAmerican Language | 15 | 740.00 | 11,100.00 |
| | | | Extended Price to Carahsoft | |
| | | TOTAL SUBSCRIPTION | | 54,300.00 |
| | | TOTAL ANNUAL RECURRING REVENUE | | 54,300.00 |
| | | TOTAL REVENUE OVER CONTRACT TERM | | 162,900.00 |

214.    Contract #1 indicates that the Navy purchased 400 Acrobat Professional licenses and 15 Creative Cloud licenses. Here, the Navy should have only purchased 345 Acrobat Professionals if they were also buying 15 Creative Clouds.

***Contract #2 (November 20, 2014)***

20 November, 2014

Craig Abod
Carahsoft Technology Corp
12369 Sunrise Valley Drive, D-2
Reston, Virginia  20191

Re:    Additional Discount for US Navy Exchange Service Command (NEXCOM)

Dear Craig Abod:

The parties are entering into a transaction ("Agreement") whereby Adobe Systems Incorporated ("Adobe") will provide certain Adobe software products ("Licensed Products") on a term basis and associated support services ("Support")  to Carahsoft Technology Corp. ("Carahsoft") for distribution through Emergent ("Reseller") to US Navy Exchange Service Command (NEXCOM) ("Customer") and is hereby authorized by Adobe to fall under the Adobe Partner Connection Distribution Agreement (Ref# 289840 as amended by Ref # 429794) between Adobe and Carahsoft.  The Effective Date is defined in Attachment A. Adobe hereby provides Carahsoft the following discounted prices for an enterprise term license agreement sales opportunity (the "ETLA Sales Opportunity"):

A.    ETLA  Sales Opportunity

The ETLA Sales Opportunity shall consist of an initial purchase and, if applicable, subsequent "true-up" term licenses as identified below in accordance with special pricing and terms of a three (3) year Enterprise Term License Agreement set forth in Attachment A hereto (the "ETLA").

Table 1: Standard Deployment

Pricing for Year One, Two & Three Annual Installments:

| SKU | Description | Estimated QTY | Extended Price to Carahsoft | |
|---|---|---|---|---|
| | | | Unit Price | Total |
| | SUBSCRIPTION | | Yr. 1 Subscription Pricing | |
| 65227934VA | Acrobat Prof 0 MLP Term w Maint & Gold Multi NorthAmerican Language | 284 | 44.00 | 12,496.00 |
| 65232265VA | Illustrator 0 MLP S/W Subscription Only Multi NorthAmerican Language | 21 | 220.00 | 4,620.00 |
| 65232256VA | Adobe InCopy 0 MLP S/W Subscription Only Multi NorthAmerican Language | 3 | 220.00 | 660.00 |
| 65232250VA | InDesign 0 MLP S/W Subscription Only Multi NorthAmerican Language | 18 | 220.00 | 3,960.00 |
| 65232237VA | Photoshop 0 MLP S/W Subscription Only Multi NorthAmerican Language | 51 | 220.00 | 11,220.00 |
| 65227741VA | Creative Cloud ENT - Design and Web Premium 0 MLP S/W Subscription Only Multi NorthAmerican Language | 39 | 450.00 | 17,550.00 |
| 65227736VA | Creative Cloud ENT - Production Premium 0 MLP S/W Subscription Only Multi NorthAmerican Language | 3 | 450.00 | 1,350.00 |
| 65232301VA | Creative Cloud ENT 0 MLP S/W Subscription Only Multi NorthAmerican Language | 6 | 600.00 | 3,600.00 |
| | | | Extended Price to Carahsoft Yr. 1 Subscription Pricing | |
| | TOTAL SUBSCRIPTION | | | 65,456.00 |
| | TOTAL ENHANCED SUPPORT | | | - |
| | TOTAL REVENUE | | | 65,456.00 |

Pricing Total

215.    Contract #2 indicates that the Navy purchased 264 Acrobat Professional licenses, 39 Creative Cloud (Design and Web Premium) licenses, 3 Creative Cloud (Production Premium) licenses, and 6 Creative Cloud licenses.

216.    Here, upon information and belief, the Navy did not need the additional Creative Cloud licenses – 3 Creative Cloud (Production Premium) and 6 Creative Cloud.

217.    Moreover, the Navy did not even need to purchase 39 Creative Clouds, if they were purchasing 264 Acrobat Professional licenses. In other words, the Navy was making double purchases of Acrobat licenses by purchasing both Acrobat and different forms of Creative Cloud.

***Contract #3 (April 6, 2015)***

6 April, 2015

Craig Abod
Carahsoft Technology Corp
12369 Sunrise Valley Drive, D-2
Reston, Virginia 20191

Re:    Additional Discount for the United States Department Of The Navy

Dear Craig Abod:

The parties are entering into a transaction ("Agreement") whereby Adobe Systems Incorporated ("Adobe") will provide certain Adobe software products ("Licensed Products") on a term basis and associated support services ("Support") to Carahsoft Technology Corp. ("Carahsoft") for distribution through Emergent ("Reseller") to the United States Department Of The Navy ("Customer") and is hereby authorized by Adobe to fall under the Adobe Partner Connection Distribution Agreement (Ref# 289840 as amended by Ref # 429794) between Adobe and Carahsoft.  The Effective Date is defined in Attachment A. Adobe hereby provides Carahsoft the following discounted prices for an enterprise term license agreement sales opportunity (the "ETLA Sales Opportunity"):

**A.    ETLA Sales Opportunity**

The ETLA Sales Opportunity shall consist of an initial purchase and, if applicable, subsequent "true-up" term licenses as identified below in accordance with special pricing and terms of a three (3) year Enterprise Term License Agreement set forth in Attachment A hereto (the "ETLA").

**Total Minimum 3 Year Purchase Order Commitment Value:**

| Line Number | SKU | Product Description | Billing Cycle | Quantity | Unit Of Measure/ Metric | License Term Start Date | License Term End Date | Unit Price | Total Fees |
|---|---|---|---|---|---|---|---|---|---|
| 01 | 65227934 | Acrobat Professional ALL MLP Term w Maint & Gold MUN 1S ETLA | Advance I Annually – In | 1,800.00 | Each COMPUTE R Per Year | 1 May 2015 | 30 April 2018 | 72.20 | 389,880.00 |
| 02 | 65232280 | Dreamweaver ALL MLP SW Subscription Only MUN 1S CCE | Advance I Annually – In | 1.00 | Each USER Per Year | 1 May 2015 | 30 April 2018 | 250.00 | 750.00 |
| 03 | 65232270 | Flash Pro ALL MLP SW Subscription Only MUN 1S CCE | Advance I Annually – In | 1.00 | Each USER Per Year | 1 May 2015 | 30 April 2018 | 250.00 | 750.00 |
| 04 | 65228777 | Lightroom ALL MLP Term w Maint & Gold MUN 1S ETLA | Advance I Annually – In | 1.00 | Each COMPUTE R Per Year | 1 May 2015 | 30 April 2018 | 70.00 | 210.00 |
| 05 | 65232237 | Photoshop ALL MLP SW Subscription Only MUN 1S CCE | Advance I Annually – In | 40.00 | Each USER Per Year | 1 May 2015 | 30 April 2018 | 250.00 | 30,000.00 |
| 06 | 65227749 | Creative Cloud ENT ALL MLP SW Subscription Only MUN 1S COMPLETE 2G | Advance I Annually – In | 2.00 | Each USER Per Year | 1 May 2015 | 30 April 2018 | 700.00 | 4,200.00 |
| 07 | 65232265 | Illustrator ALL MLP SW Subscription Only MUN 1S CCE | Advance I Annually – In | 100.00 | Each USER Per Year | 1 May 2015 | 30 April 2018 | 250.00 | 75,000.00 |
| | | | | | | | Adobe On-premise Services | | 500,790.00 |

3 Year License: $500,790.00

Year 1    $166,930.00
Year 2    $166,930.00
Year 3    $166,930.00

218.    The line items in Contract #3 indicate that the Navy purchased unnecessary types and quantities of Adobe products. If it was purchasing 1,800 Acrobat Professional licenses, it did not need additional licenses, including Dreamweaver, Flash Pro, Lightroom, Photoshop, Creative Cloud, and Illustrator.

219.    Relying on Adobe's expertise and expecting Carahsoft to accurately bill for procurement, the government is routinely deprived of federal funds, while Adobe, Carahsoft, and CDW-G commit fraud to boost sales of the Suite.

C.    _Adobe Creates Software Bundles and Causes Carahsoft to Improperly Bill the Government for Unnecessary Software_

220.    Adobe continues its fraudulent scheme by creating custom software bundles for government customers. Adobe conspires with Carahsoft to add unnecessary software applications into bundles and retains improper payment for applications that a government end-user neither requests nor knows of its existence.

221.    Adobe is selling intentionally fabricated bundles. In fact, some of the bundling is at the complete discretion of the Adobe sales management team, thus allowing Adobe to create bundles with the intent and motive to increase sales for its financial benefit, without detection.

222.    In short, government end-users have no idea what they are paying for in these so-called bundles, let alone have knowledge of the type of software licenses available in the bundles, nearly all of which are left dormant and never downloaded for actual use, mainly because the government is unaware that it has access to the software.

223.    Moreover, should the government end-user ever discover the existence of the software licenses included in the bundles, none of its functionalities are relevant.

224.    By virtue of Relator Whalen's role as the Account Executive for Public Sector Sales and managing civilian accounts, she personally observed senior executives conspiring with partners to perpetuate the fraud and provides representative examples to that effect.

### *United States Merit Systems Protection Board*

225.    For example, on or about June 21, 2016, it was first brought to Relator Whalen's attention that Dave Roy, Adobe Account Manager, intentionally created a software bundle containing Adobe Acrobat Pro and Adobe Echosign licenses for a deal that closed on or about April 30, 2015. Engaging Softchoice (reseller) for this transaction, Mr. Roy and Softchoice had ultimately caused Carahsoft to inflate claims for payment billed to the U.S. Merit Systems Protection Board ("MSPB") for a bundle that included both Acrobat Pro and Echosign.

226.     At the time the deal was closed, MSPB was under the impression that they were purchasing solely Acrobat Pro, the only software license they needed and requested. MSPB neither needed Echosign, nor knew it was being included in the bundle. Moreover, MSPB had no idea that such a bundle inflated the procurement price.

227.     However, during the renewal process, MSPB had discovered Echosign and immediately asked for removal of the license and accordingly, a lower procurement price. To that effect, on June 20, 2016, Braeden Carr, Account Manager at Carahsoft, emails Andrew Labus, Enterprise Contract Renewal Specialist at Carahsoft for Adobe, and explains to him that "there is some pushback on the Echosign" from MSPB:

From: Braeden Carr ███████████████████████
Sent: Monday, June 20, 2016 10:15 AM
To: Lara Silva ████████████████
Subject: FW: USMSPB Adobe Renewal - Softchoice Quote 7730991

Hi Lara,

The wheels appear to be moving on this renewal however looks like there is some pushback on the EchoSign.  Can you answer the below?

**Braeden Carr**
**Account Manager**
███████████ & Local Government (CA, OR, WA) US Federal
**US Public Sector | Softchoice**
Direct: ███████████
████████████████████████
www.softchoice.com
GSA Contract: GS-35F-0196M
NASA SEWP V Contract: NNG15SC48B

From: Andrew Labus ████████████████████████
Sent: Monday, June 20, 2016 12:38 PM
To: Braeden Carr ██████████████████
Subject: RE: USMSPB Adobe Renewal - Softchoice Quote 7730991

Hi Braedon,

I'll be your POC on this one moving forward. Adobe has it written in their terms and conditions that they cannot "true down" or remove products so typically Adobe won't just remove this from their contract.

Can you go back to the customer and inform them EchoSign was part of their original deal and they need to renew everything from year to year.

Thanks,
Andrew

ANDREW LABUS
ENTERPRISE CONTRACT RENEWAL SPECIALIST | ADOBE GOVERNMENT
_____

carahsoft
CARAHSOFT TECHNOLOGY CORP.
1860 MICHAEL FARADAY DRIVE | SUITE 100 | RESTON, VA  20190
T: ████████████ | 877 99-ADOBE  | F: ████████████
██████████████ | www.CARAHSOFT.COM | http://connect.carahsoft.com/andrewlabus

**From:** Braeden Carr ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, June 20, 2016 5:13 PM
**To:** Andrew Labus ▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: USMSPB Adobe Renewal - Softchoice Quote 7730991

Hi Andrew,

I've let the customer know the below and they seem to be pretty set on revising this agreement to remove EchoSign.  What are the next steps?

228.    In the next email response from Mr. Labus, he tells Relator Whalen that MSPB "does not want to renew the EchoSign portion," which leads to her efforts to contact Mr. Roy to find out why Echosign had been included in the bundle in the first place:

**From:** Andrew Labus ▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, June 21, 2016 8:47 AM
**To:** Braeden Carr ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Carrie Whalen ▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: USMSPB Adobe Renewal - Softchoice Quote 7730991

Good morning Carrie,

Merit Systems Protection Board does not want to renew the EchoSign portion of their ETLA. How do you want to move forward with this customer?

Previous SO # 139735858. This was supposed to be an April renewal so they are a few months late already.

Thanks,

**From:** Carrie Whalen
**Sent:** Tuesday, June 21, 2016 9:51 AM
**To:** Dave Roy
**Cc:** Mina Pham
**Subject:** FW: USMSPB Adobe Renewal - Softchoice Quote 7730991

Dave,
  Do you know if this was a bundled deal?  The customer doesn't seem to know they have E-sign and the partner has definitely broken it out on their renewal quote.  The discount letter has it broken out.  Let me know if you remember the details.  I reached out to Matt but he thought you might have more information.

Thanks,
Carrie

229.    Mr. Roy tells Relator Whalen that a software bundle was given to MSPB and she discovers that the MSPB was never actually told that they would be charged for two different licenses in the bundle. In fact, when Relator Whalen asks Mr. Roy, "Did the customer know they were getting e-sign…," Mr. Roy answers, "We told the customer but quoted it as Acrobat Pro with eSign," indicating that Adobe never wanted to inform MSPB that they were paying for a bundled deal:

78

**From:** Dave Roy
**Sent:** Tuesday, June 21, 2016 10:46 AM
**To:** Carrie Whalen ▮▮▮▮▮▮▮
**Cc:** Mina Pham ▮▮▮▮▮▮
**Subject:** RE: USMSPB Adobe Renewal - Softchoice Quote 7730991

We gave them Acrobat Premium but broke it out into Pro and Sign.

Dave Roy
Account Manager
Adobe Government
Office: ▮▮▮
Cell: ▮▮▮▮

**From:** Carrie Whalen
**Sent:** Tuesday, June 21, 2016 1:01 PM
**To:** Dave Roy
**Cc:** Mina Pham
**Subject:** RE: USMSPB Adobe Renewal - Softchoice Quote 7730991

Did the customer know they were getting e-sign – was there a pilot program or anything that I can tie it to?
Any idea why the partner would have broken out the products?

Thanks,
Carrie

**From:** Dave Roy
**Sent:** Tuesday, June 21, 2016 1:24 PM
**To:** Carrie Whalen ▮▮▮▮▮▮▮▮
**Cc:** Mina Pham ▮▮▮▮▮▮
**Subject:** RE: USMSPB Adobe Renewal - Softchoice Quote 7730991

We told the customer but quoted it as Acrobal Pro with eSign.

Dave Roy
Account Manager
Adobe Government
Office: ▮▮▮▮
Cell: ▮▮▮▮▮
Dial In: ▮▮▮▮▮▮ / Participant Conference code: ▮▮▮▮▮
Adobe Connect: ▮▮▮
Mobile Friendly Dial In: ▮▮▮▮▮▮▮▮

230.    Mr. Roy was incentivized through an internal compensation agreement with

Adobe to sell Echosign, essentially as a bundle deal with Acrobat Pro, which was the only line

item MSPB needed and requested.

231.     In sum, MSPB owned Echosign but were unaware they owned it, let alone paid

for it. MSPB did not know it was part of its initial procurement purchase. When they discovered

Echosign, the agency immediately requested removal.

232.     Adobe and Carahsoft had engaged in conspiracy to fraudulently induce MSPB to

purchase a bundle deal and collected revenue totaling at least $304,560.00 from the three-year

term contract.

***Walter Reed National Military Medical Center***

233.     In another similar representative example, the improper sale and billing of

bundles indicates that senior executives, including Barry Leffew, former Vice President of

Adobe's Public Sector, and Chris Ahearn, Vice President of Sales, knew about the fraud and

took initiative to facilitate it by instructing Adobe Sales Representatives to induce government

customers to purchase a bundle.

234.     In or about July 2012, the Walter Reed National Military Medical Center ("Walter

Reed") purchased Acrobat licenses through its Carahsoft contract.

235.     Three years later, in or about July 2015, a Walter Reed representative contacted

Sean McRee, Adobe Sales Representative, to ask about the terms and provisions of the renewal.

Walter Reed had realized from the renewal quote, which inadvertently broke down the bundle

into separate products, that it had initially paid for Acrobat and AEM forms, and not just the

Acrobat. During the three years, the organization had no idea that it owned a bundle containing

both Acrobat and AEM forms, which inflated its purchase price and annual term fees.

236.     The organization immediately asked for the AEM forms to be removed, which

would have cut its renewal price by more than half of the current amount it was paying and had

already paid.

237.    In response to the organization's complaints, an internal meeting was held to discuss the matter. Mr. McRee, Ms. Rich, Adobe District Manager, Digital Media Public Sector, and both Relators Whalen and Evans attended the meeting.

238.    At the meeting, Mr. McRee informed the team that Mr. Ahearn instructed him to provide two renewal quotes for Walter Reed – one for Acrobat as a standalone product and one for the bundle, which included Acrobat and AEM forms. Mr. McRee also added that Mr. Ahearn told him to price the standalone Acrobat license higher than the bundle to show Walter Reed the benefits of purchasing the bundle.

239.    Such information was deliberately fabricated to induce Walter Reed to purchase a bundle deal for the renewal price. Had Walter Reed purchased the Acrobat license as a standalone initially, it would have been significantly cheaper than purchasing a bundle.

240.    However, Mr. Ahearn ordered the Adobe sales team to inflate the price of the Acrobat to force Walter Reed to continue to pay for the bundle.

241.    Eventually, Walter Reed was induced to purchasing the Acrobat-AEM form bundle under its contract with Carahsoft and the deal was renewed on or about November 4, 2015, even though Adobe knew that Walter Reed had never used AEM forms previously and did not have any plans to download AEM forms during the renewed term.

242.    Adobe caused Carahsoft to bill for at least $355,000.00 by virtue of the misrepresentations.

243.    In summary, Adobe sales managers are constantly pressured and ordered to create bundles in order to inflate the sale of products other than Acrobat and generate revenue for the company. In fact, high level Adobe executives, including Mr. Leffew, Mr. Ahearn, and Ms. Rich, facilitated the fraud to display the growth of non-Acrobat products to shareholders.

*Navy and the Next Generation Enterprise Network ("NGEN") Contract*

244.    Relator Whalen also provides insight into a unique contract that engaged Hewlett-Packard ("HP") as an agent of the government to supply software solutions for the Navy under the NGEN contract. Such contract was established in or about June 2013. In practice, the contract essentially involved the Adobe sales team and Carahsoft to work with HP to execute the terms and provisions of the Navy's NGEN contract.

245.    During a call on or about March 25, 2015, HP informed Relator Whalen, Dan Carroll, Adobe Sales Representative, and Cortney Steiner, Vice President of Sales at Carahsoft, that they wanted to purchase 5,000 Acrobat licenses.

246.    In a meeting with Relator Whalen to develop pricing proposals in or about April 2015, Ms. Steiner, who managed the HP relationship with Adobe Sales Team for Carahsoft, disclosed to Relator Whalen that there was a "slush fund" built into every Acrobat purchase under the Navy's NGEN contract. In other words, the Adobe sales team and Carahsoft utilized the "slush fund" to essentially sell a bundle adding AEM forms with Acrobat, or sometimes adding other software products like Lean Print with Acrobat.

247.    Ms. Steiner explained to Relator Whalen that there was a large delta between the contract price to HP and the cost Carahsoft pays Adobe for Acrobat as a standalone product. In essence, that large delta served as a "slush fund."

248.    The "slush fund" was exclusively used to create bundles in order to add AEM forms or Lean Print. Upon information and belief, the Navy ultimately paid for a procurement price that was substantially higher than what it would have paid for Acrobat licenses. Had it been properly informed that the price accounted for a bundle deal that included Acrobat and AEM forms or Acrobat and Lean Print, the Navy would never have agreed to make that purchase.

249.    To avoid detection, Adobe and Carahsoft conspired to never disclose such a method of utilizing the "slush fund" to HP, which was acting as an agent of the Navy, as well as to the Navy, which was billed for the procurement under its NGEN contract.

250.    Relator Whalen immediately raised concerns, refusing to create a bundle adding AEM forms and stating that she had "no intention of adding licenses (whether AEM forms or Lean Print) that the government customer did not request or need." But her efforts to cabin the "slush fund" was given only token respect.

251.    In fact, that same afternoon, following her meeting with Ms. Steiner, Mr. Ahearn came into Relator Whalen's office and informed her that Ms. Steiner had contacted him about their discussion. Mr. Ahearn made it clear that Relator Whalen was to utilize the "slush fund" without questioning the process. He added that the bundle did not necessarily have to include AEM forms but could include other software licenses.

252.    Several hours later, Ms. Rich also came into Relator Whalen's office and asked if "she got the message." Relator Whalen answered that "the message was loud and clear."

253.    In or about October 2015, Adobe and Carahsoft closed a deal with HP for 5,000 Acrobat licenses, billing $1.5 million to the Navy's NGEN contract.

254.    The deal was actually comprised of both Acrobat and Lean Print licenses, which generated a total of at least $3.6 million for three years.

255.    Unlike hundreds of other Navy NGEN contracts which were targeted with Adobe and Carahsoft's use of the "slush fund," this particular transaction included a footnote in the quote from Carahsoft to HP, indicating that the Navy would have access to Lean Print at no additional charge.

256.     Ms. Steiner told Relator Whalen that this was the first time they decided to provide notice with a footnote because Carahsoft was recently audited. She added however, that HP would most likely never notice the footnote and that the language would not be passed onto the Navy.

257.     In summary, the Navy's NGEN contract, which engaged HP to negotiate procurement with Adobe and Carahsoft, was closed under fraudulent circumstances. Upon information and belief, like the other bundle examples, the Navy never used the Lean Print licenses and did not know it came with the bundle, but paid for them.

258.     For years, there was no effort to correct and overhaul the software bundling scheme, which included the "slush fund" for particular contracts involving HP and the Navy NGEN contract.

259.     Instead, instructions to facilitate the bundling scheme came from the top. For nearly every single Navy NGEN contract, Mr. Leffew specifically approved Mr. Ahearn to order the Adobe sales team to conspire with Carahsoft to push the sale of bundles.

## COUNT 1
### FALSE CLAIMS ACT VIOLATION
(False Claims 31 U.S.C. § 3729(a)(1)(A))
(Defendants Adobe, Carahsoft, Emergent, and CDW-G)

260.     Relators restate, adopt, and incorporate by referencing all paragraphs of this Amended Complaint herein.

261.     This is a claim brought by Relators and the United States to recover treble damages, civil penalties, and the fees and costs of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, *et seq.*

262.     The FCA, 31 U.S.C. § 3729(a)(1)(A), provides that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval … is liable to the United States
> Government for any civil penalty of not less than $5,000 and not more
> than $10,000 … plus 3 times the amount of damages which the
> Government sustains because of the act of that person.

31 U.S.C. § 3729.

263.    By virtue of the above-described acts, among others, since at least 2011,

Defendants Adobe, Carahsoft, Emergent, and CDW-G knowingly caused to be presented false or

fraudulent claims for payment or approval of services for payment pursuant to the kickback

scheme and continues to cause to be submitted false or fraudulent claims for payment or

approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

264.    In addition, the AKA, 41 U.S.C § 51 *et seq.* prohibits entities involved in

government contracting and procurement from offering, accepting, or attempting to accept

inducements for favorable treatment in awarding contracting for products and services to

prospective government customers. *See* FAR 3.502-2: Subcontractor Kickbacks.

265.    First, by offering illegal kickbacks to its partners under the Solution Partner

Program in order to fraudulently induce the government to procure Adobe software solutions,

Adobe violated the AKA.

266.    Adobe's material violations of the AKA caused creation and submission of false

and fraudulent records, statements, and claims to the government to pay for claims submitted

under its contract with Carahsoft, which carries Adobe products and services, further violating

the FCA.

267.    Second, for the majority of the partners that participate in the partner program,

Carahsoft is the master GSA Schedule holder for Adobe software solutions. While the partner

and the Adobe sales team engage in deal registration for the government customer, it is Carahsoft

that allows partners to act as agents or teaming partners under its GSA Schedule with those partners billing the government for payment.

268.    In nearly all of the cases, without Carahsoft, a deal registration influenced and closed by Adobe and a partner, could not be paid for by the government. As such, Adobe conspired with Carahsoft to cause to be presented false or fraudulent claims for payment or approval of services for payment pursuant to the kickback scheme and continues to cause to be submitted false or fraudulent claims for payment or approval, making Carahsoft also liable for the alleged kickback scheme.

269.    Third, some partners are resellers that also have privity of contract with the government. This means that companies like Emergent and CDW-G are GSA Schedule holders that are equally capable of directly distributing and billing government entities for Adobe products and services. As such, Adobe and partners like Emergent and CDW-G engaged in conspiracy to operate the kickback program. Of note, although Emergent and CDW-G had their own schedules, it did not preclude them from using Carahsoft as an agent or teaming partner.

270.    Moreover, as re-sellers, both Emergent and CDW-G also gained an upfront profit margin by obtaining access to a discounted rate for Adobe products and services, which enabled them to sell to the government for a substantially higher price.

271.    Therefore, not only did Emergent and CDW-G obtain illegal kickbacks from Adobe in exchange for securing government contracts, but they also received sales profit at the outset, which encouraged them to sell Adobe products and services over competitive products. Neither Adobe, Emergent, nor CDW-G disclosed such a factor to any government customer.

272.    Adobe's conspiracy with Emergent and CDW-G to facilitate the kickback scheme caused the submission of false or fraudulent claims for payment.

273.     In sum, Defendants failed to follow federal statutes, regulations, and FAR standards, violating the provision of the FCA addressing the submission of false claims and violating the AKA prohibiting kickbacks.

274.     As a result of Defendants' wrongdoing and improper conduct, federal agencies made payments to Defendants based upon false and fraudulent claims and suffered damages. The United States is entitled to full recovery of the amount paid by federal agencies for the false or fraudulent claims caused to be submitted by Defendants.

275.     As set forth in the preceding paragraphs in this Amended Complaint, Adobe, Carahsoft, Emergent, and CDW-G, knowingly violated 31 U.S.C. §3729(a)(1)(A) and damaged the United States by their action in an amount to be determined at trial and totaling many millions of dollars.

**COUNT 2**
**FALSE CLAIMS ACT VIOLATION**
**(Violation of 31 U.S.C. § 3729(a)(1)(B))**
**(Defendants Adobe, Carahsoft, Emergent, and CDW-G)**

276.     Relators restate, adopt, and incorporate by referencing all paragraphs of this Amended Complaint herein.

277.     This is a claim brought by Relators and the United States to recover treble damages, civil penalties, and fees and costs of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, *et seq*.

278.     The FCA, 31 U.S.C. § 3729(a)(1)(B), provides that any person who:

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim … is liable to the United States Government for any civil penalty of not less than $5,000 and not more than $10,000 … plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

279.    By virtue of the above-described acts, among others, since at least 2011, Defendants Adobe, Carahsoft, Emergent, and CDW-G knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the United States Government, pursuant to the kickback scheme, in violation of 31 U.S.C. § 3729(a)(1)(B).

280.    In addition, the AKA, 41 U.S.C § 51 *et seq.* prohibits entities involved in government contracting and procurement from offering, accepting, or attempting to accept inducements for favorable treatment in awarding contracting for products and services to prospective government customers. *See* FAR 3.502-2: Subcontractor Kickbacks.

281.    First, by virtue of the kickbacks, misrepresentations and submissions of claims described above, Defendants knowingly presented or caused to be presented misleading and false or fraudulent claims for payment or approval to government agencies and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

282.    The claims Defendants submitted or caused to be submitted failed to disclose the underlying violation of the AKA and/or affirmatively misrepresented that the claims were made in compliance with all applicable laws, including the AKA.

283.    Records and/or statements that Defendants made or used or caused to be made or used were foreseeable and the intended result that those statements and/or records would result in the payment of false claims submitted under its contract with Carahsoft, which carries Adobe products and services, violated the FCA.

284.    Second, for the majority of the partners that participate in the partner program, Carahsoft is the master GSA Schedule holder for Adobe software solutions. While the partner

and the Adobe sales team engage in deal registration for the government customer, it is Carahsoft that allows partners to act as agents or teaming partners under its GSA Schedule with those partners billing the government for payment.

285.     In nearly all of the cases, without Carahsoft, a deal registration influenced and closed by Adobe and a partner, could not be paid for by the government. Thus, Adobe conspired with Carahsoft to knowingly make, use, or cause to make or use false records or statements material to a false or fraudulent claim to the United States pursuant to the kickback scheme, making Carahsoft also liable for the alleged kickback scheme.

286.     Third, some partners are resellers that also have privity of contract with the government. This means that companies like Emergent and CDW-G are GSA Schedule holders that are equally capable of directly distributing and billing government entities for Adobe products and services. As such, Adobe and partners like Emergent and CDW-G engaged in conspiracy to operate the kickback program. Of note, although Emergent and CDW-G had their own schedules, it did not preclude them from using Carahsoft as an agent or teaming partner.

287.     Moreover, as re-sellers, both Emergent and CDW-G gained an upfront profit margin by obtaining access to a discounted rate for Adobe products and services, which enabled them to sell to the government for a substantially higher price.

288.     Therefore, not only did Emergent and CDW-G obtain illegal kickbacks from Adobe in exchange for securing government contracts but they also received sales profit at the outset, which encouraged them to sell Adobe products and services over competitive products. Neither Adobe, Emergent, nor CDW-G disclosed such a factor to any government customer.

289.     Adobe's conspiracy with Emergent and CDW-G to facilitate the kickback scheme caused them to knowingly make, use, or cause to make or use false records or statements material to a false or fraudulent claim to the United States pursuant to the kickback scheme.

290.     In sum, Defendants failed to follow federal statutes, regulations, and FAR standards, violating the provision of the FCA addressing the submission of false records and statements and violating the AKA prohibiting kickbacks, resulting in improper payments from the government that were not refunded but were kept.

291.     As a result of Defendants' fraudulent course of conduct, with actual knowledge of falsity and/or in deliberate ignorance or reckless disregard that such records, statements, and representations were false, Defendants made, used, or caused to be made or used, false records or statements material to false or fraudulent claims and suffered damages. The United States is entitled to full recovery of the amount paid by federal agencies for the false or fraudulent records and statements submitted by Defendants.

292.     As stated in the preceding paragraphs in this Amended Complaint, Adobe, Carahsoft, Emergent, and CDW-G knowingly violated 31 U.S.C. § 3729(a)(1)(B) and damaged the United States by their action in an amount to be determined at trial and totaling many millions of dollars.

### COUNT 3
### FALSE CLAIMS ACT VIOLATION
### (Violation of 31 U.S.C. § 3729(a)(1)(A))
### (Defendants Adobe, Carahsoft, and CDW-G)

293.     Relators restate, adopt, and incorporate by reference all paragraphs of this Amended Complaint herein.

294.     This is a claim brought by Relators and the United States to recover treble damages, civil penalties, and the fees and costs of this action, under the False Claims Act, 31

U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising

from the Defendants' violations of the False Claims Act, 31 U.S.C. 3729-3733, *et seq.*

295.    The FCA, 31 U.S.C. § 3729(a)(1)(A), provides that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval … is liable to the United States
> Government for any civil penalty of not less than $5,000 and not more
> than $10,000 … plus 3 times the amount of damages which the
> Government sustains because of the act of that person.

31 U.S.C. § 3729.

296.    By virtue of the above-described acts, among others, Defendants Adobe,

Carahsoft, and CDW-G knowingly caused to be presented false or fraudulent claims by falsely

and fraudulently representing the quantity and type of Adobe software solutions that the

government should have purchased and continues to cause to be submitted false or fraudulent

claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

297.    First, Adobe engaged in an intentional fraudulent scheme to misrepresent Adobe

Buying Programs, forcing Adobe sales managers to record inaccurate invoices for software

licenses used by government employees at home, and thus, causing Carahsoft to overcharge the

government for payment.

298.    Carahsoft facilitated the fraud by invoicing the government with annual fees for

all licenses even though the government had no obligation to pay for licenses that were procured

by government employees for personal use.

299.    Second, Adobe also caused the submission of false claims, reports, and statements

by conspiring with Carahsoft and CDW-G to fraudulently induce government customers under

the ETLA contract to procure unnecessary Adobe software licenses when they only requested

Acrobat as a standalone product.

300.     As a result, Carahsoft and CDW-G billed for software licenses included in the Suite package that the government agency neither needed nor requested.

301.     Third, Adobe also conspiring with Carahsoft, created software bundles in order to sell unrequired software applications and retained improper payment for applications that a government end-user neither requested nor knew of its existence.

302.     Adobe upper management and affiliated sales managers, Carahsoft, and CDW-G knew about and facilitated the fraud described above.

303.     Defendants knew and intended to violate FAR regulations and governing laws, to deceive government agencies and to obtain and keep funds to which they were not entitled and should have returned. As described herein, in order to request and receive improper government payments, Defendants caused to be presented false or fraudulent claims by falsely and fraudulently representing the quantity and type of Adobe software solutions that the government should actually be purchasing.

304.     In sum, Defendants failed to follow federal statutes, regulations, and FAR standards, violating the provision of the FCA addressing the submission of false claims.

305.     As a result of Defendants' wrongdoing and improper conduct, federal agencies made payments to Defendants based upon false and fraudulent claims and suffered damages. The United States is entitled to full recovery of the amount paid by federal agencies for the false or fraudulent claims caused to be submitted by Defendants.

306.     As set forth in the preceding paragraphs in this Amended Complaint, Adobe, Carahsoft, and CDW-G, knowingly violated 31 U.S.C. §3729(a)(1)(A) and damaged the United States by their action in an amount to be determined at trial and totaling many millions of dollars.

## COUNT 4
## FALSE CLAIMS ACT VIOLATION

**(Violation of 31 U.S.C. § 3729 (a)(1)(B))**
**(Defendants Adobe, Carahsoft, and CDW-G)**

307.     Relators restate, adopt, and incorporate by referencing all paragraphs of this

Amended Complaint herein.

308.     This is a claim brought by Relators and the United States to recover treble

damages, civil penalties, and fees and costs of this action, under the False Claims Act, 31 U.S.C.

§§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the

Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, *et seq.*

309.     The FCA, 31 U.S.C. § 3729(a)(1)(B), provides that any person who:

> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to a false or fraudulent claim … is liable to
> the United States Government for any civil penalty of not less than $5,000
> and not more than $10,000 … plus 3 times the amount of damages which
> the Government sustains because of the act of that person.

31 U.S.C. § 3729.

310.     By virtue of the above-described acts, among others, Defendants Adobe,

Carahsoft, and CDW-G knowingly made, used, or caused to be made or used false records or

statements material to a false or fraudulent claim to the United States by falsely and fraudulently

representing the quantity and type of Adobe software solutions that the government should have

purchased,  and continues to cause to be submitted false or fraudulent claims for payment or

approval, in violation of 31 U.S.C. § 3729(a)(1)(B).

311.     First, Adobe engaged in an intentional fraudulent scheme to misrepresent Adobe

Buying Programs, forcing Adobe sales managers to record inaccurate invoices for software

licenses used by government employees at home, and thus, causing Carahsoft to submit false

records and statements in order to overcharge the government for payment.

312.     Carahsoft facilitated the fraud by invoicing the government with annual fees for all licenses even though the government had no obligation to pay for licenses that were procured by government employees for personal use.

313.     Second, Adobe, conspired with Carahsoft and CDW-G to knowingly and intentionally submit false records and statements to fraudulently induce government customers under the ETLA contract to procure unnecessary Adobe software licenses when they requested Acrobat as a standalone product.

314.     As a result, Carahsoft and CDW-G billed for software licenses included in the Suite package that the government agency neither needed nor requested.

315.     Third, Adobe also conspiring with Carahsoft, created software bundles to sell unrequired software applications and retained improper payment for applications that a government end-user neither requested nor knew of its existence.

316.     Adobe upper management and affiliated sales managers, Carahsoft, and CDW-G knew about and facilitated the fraud described above.

317.     Defendants knew and intended to violate FAR regulations and governing laws to deceive government agencies and to obtain and keep funds to which they were not entitled and should have returned. As described herein, in order to request and receive improper government payments, Defendants caused to be presented false or fraudulent claims by falsely and fraudulently representing the quantity and type of Adobe software solutions that the government should have purchased.

318.     In sum, Defendants failed to follow federal statutes, regulations, and FAR standards, violating the provision of the FCA addressing the submission of false records and

statements, resulting in improper payments from the government that were not refunded but were kept.

319.   As a result of Defendants' fraudulent course of conduct, with actual knowledge of falsity and/or in deliberate ignorance or reckless disregard that such records, statements, and representations were false, Defendants made, used, or caused to be made or used, false records or statements material to false or fraudulent claims and suffered damages. The United States is entitled to full recovery of the amount paid by federal agencies for the false or fraudulent records and statements submitted by Defendants.

320.   As set forth in the preceding paragraphs in this Amended Complaint, Adobe, Carahsoft, and CDW-G, knowingly violated 31 U.S.C. § 3729(a)(1)(B) and damaged the United States by their action in an amount to be determined at trial and totaling many millions of dollars.

**COUNT 5**
**FALSE CLAIMS ACT VIOLATION**
**(Violation of 31 U.S.C. § 3729 (a)(1)(C))**
**(Defendants Adobe, Carahsoft, Emergent, and CDW-G)**

321.   Relators restate, adopt, and incorporate by referencing all paragraphs of this Amended Complaint herein.

322.   This is a claim brought by Relators and the United States to recover treble damages, civil penalties, and the cost of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, *et seq*.

323.   The FCA, 31 U.S.C. § 3729(a)(1)(C), provides that any person who:

(a)(1)(C) conspires to commit a violation of [false claims 31 U.S.C. § 3729(a)(1)(A); false statements 31 U.S.C. § 3729(a)(1)(B); and 31 U.S.C. § 3729(a)(1)(G)] … is liable to the United States Government for any civil penalty of not less than $5,000 and not more than $10,000 … plus 3 times

the amount of damages which the Government sustains because of the act
of that person.

31 U.S.C. § 3729.

324.    Defendants conspired with one another to facilitate a fraudulent scheme that

negatively impacted the United States in a variety of ways.

325.    First, by offering illegal kickbacks to its partners under the Solution Partner

Program in order to fraudulently induce the government to procure Adobe software solutions,

Adobe violated the AKA.

326.    Adobe's material violations of the AKA caused creation and submission of false

and fraudulent records, statements, and claims to the government to pay for claims submitted

under its contract with Carahsoft, which carries Adobe products and services, also violating the

FCA.

327.    In addition, for the majority of the partners that participate in the partner program,

Carahsoft is the master GSA Schedule holder for Adobe software solutions. While the partner

and the Adobe sales team engage in deal registration for the government customer, it is Carahsoft

that allows partners to act as agents or teaming partners under its GSA Schedule with those

partners billing the government for payment.

328.    In nearly all of the cases, without Carahsoft, a deal registration influenced and

closed by Adobe and a partner, could not be paid for by the government. Thus, Adobe conspired

with Carahsoft to cause to be presented false or fraudulent claims for payment or approval of

services for payment pursuant to the kickback scheme and continues to cause to be submitted

false or fraudulent claims for payment or approval, making Carahsoft also liable for the alleged

kickback scheme.

329.     Moreover, some partners are resellers that also have privity of contract with the government. This means that companies like Emergent and CDW-G are GSA Schedule holders are equally capable of directly distributing and billing government entities for Adobe products and services. As such, Adobe and business level partners, like Emergent and CDW-G, are engaged in conspiracy to operate the partner program as a kickback program. Of note, although Emergent and CDW-G had their own schedules, this did not preclude them from using Carahsoft as an agent or teaming partner.

330.     As re-sellers, both Emergent and CDW-G also gained an upfront profit margin by obtaining access to a discounted rate for Adobe products and services, which enabled them to sell to the government for a substantially higher price.

331.     Therefore, not only did Emergent and CDW-G obtain illegal kickbacks from Adobe in exchange for securing government contracts, but they also received sales profit at the outset, which encouraged them to sell Adobe products and services over competitive products. Neither Adobe, Emergent, nor CDW-G disclosed such a factor to any government customer.

332.     Adobe's conspiracy with Carahsoft, Emergent and CDW-G to facilitate the kickback scheme caused the submission of false or fraudulent claims for payment or approval of services for payment pursuant to the kickback scheme.

333.     Second, at all times relevant, Adobe, Carahsoft, and CDW-G also authorized each other's conduct as co-conspirators.

334.     To do so, Adobe engaged in an intentional fraudulent scheme to misrepresent Adobe Buying Programs, forcing Adobe sales managers to record inaccurate invoices for software licenses used by government employees at home, and thus, causing Carahsoft to overcharge the government for payment.

335.     Carahsoft facilitated the fraud by invoicing the government with annual fees for all licenses even though the government had no obligation to pay for licenses that were procured by government employees for personal use.

336.     Adobe also caused the submission of false claims, reports, and statements by conspiring with Carahsoft and CDW-G to fraudulently induce government customers under the ETLA contract to procure additional Adobe software licenses when they only requested Acrobat as a standalone product.

337.     As a result, Carahsoft and CDW-G billed for software licenses included in the Suite package that the government agency neither needed nor requested.

338.     Adobe also conspiring with Carahsoft, created software bundles that included unrequired software applications and retained improper payment for applications that a government end-user neither requested nor knew of its existence.

339.     Defendants, collectively, knew, intended and worked in concert to violate FAR regulations and governing laws, to deceive federal agencies and to obtain and keep funds to which they are not entitled and should have returned.

340.     As a result of Defendants' wrongdoing and improper conduct, the United States was damaged and is entitled to full recovery of the amount paid by the government as a result of the fraudulent conspiracies.

341.     As set forth in the preceding paragraphs in this Amended Complaint, Defendants knowingly violated 31 U.S.C. § 3729 (a)(1)(C) and damaged the United States by their action in an amount to be determined at trial and believed to be many millions of dollars.

**COUNT 6**
**FALSE CLAIMS ACT VIOLATION**
**(Violation of 31 U.S.C. § 3729 (a)(1)(G))**
**(Defendants Adobe, Carahsoft, Emergent, and CDW-G)**

342.    Relators hereby restate, incorporate, and re-allege all other paragraphs of this Amended Complaint as fully set forth herein.

343.    As set forth above, Defendants, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, and knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money to the government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

344.    Defendants Adobe, Carahsoft, Emergent, and CDW-G, having knowingly and intentionally facilitated the kickback scheme, should not have received any money from the government. In addition, Defendants Adobe, Carahsoft, and CDW-G, having falsely and fraudulently represented the quantity and type of Adobe software solutions that the government should have purchased, should not have received any money from the government.

345.    Due to the Defendants' conduct, the United States has suffered substantial damaged to be determined at trial and believed to be many millions of dollars.

**PRAYER FOR RELIEF**

WHEREFORE, Relators pray, on behalf of the United States and themselves, that on final trial of this case, judgment be entered in favor of the United States and against Defendants as follows:

A.    On the First Cause of Action under the False Claims Act, for the amount of the United States' damages, multiplied as required by law and for such civil penalties as are allowed by law, including, but not limited to, statutory penalties for each violation, attorney's fees and costs;

B.      On the Second Cause of Action under the False Claims Act, for the amount of the United States' damages, multiplied as required by law and for such civil penalties as are allowed by law, including, but not limited to, statutory penalties for each violation, attorney's fees and costs;

C.      On the Third Cause of Action under the False Claims Act, for the amount of the United States' damages, multiplied as required by law and for such civil penalties as are allowed by law, including, but not limited to, statutory penalties for each violation, attorney's fees and costs;

D.      On the Fourth Cause of Action under the False Claims Act, for the amount of the United States' damages, multiplied as required by law and for such civil penalties as are allowed by law, including, but not limited to, statutory penalties for each violation, attorney's fees and costs;

E.      On the Fifth Cause of Action under the False Claims Act, for the amount of the United States' damages, multiplied as required by law and for such civil penalties as are allowed by law, including, but not limited to, statutory penalties for each violation, attorney's fees and costs;

F.      On the Sixth Cause of Action under the False Claims Act, for the amount of the United States' damages, multiplied as required by law and for such civil penalties as are allowed by law, including, but not limited to, statutory penalties for each violation, attorney's fees and costs;

G.      For the costs of this action, prejudgment interest, interest on the judgment, attorney's fees and for any other and further relief to which Relators and the United States may be justly entitled.

H.    That Relators be awarded the maximum amount allowed as a Relator's Share pursuant to § 3730(d) of the False Claims Act; and

I.    That Relators recover such other relief as the Court deems just and proper, or that is necessary to make Relators whole.

**COUNT 7**
**CALIFORNIA FALSE CLAIMS ACT**
**(Defendants Adobe and Carahsoft)**

346.    All paragraphs of this Amended Complaint are realleged and expressly adopted and incorporated as fully set forth herein again.

347.    This is a *qui tam* action brought by Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

348.    Cal. Gov't Code § 12651(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
(3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.
(4) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

349.    In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code § 650 and 650.1.

350.    Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software

101

solutions to state and local government customers. Defendants violated Cal. Bus. & Prof. Code §
650 and 650.1 by engaging in the kickback scheme and related conduct described in this
Amended Complaint.

351.    As is the case for federal deal registrations, clear and recognized intent and
financial motive by Adobe to affect the solicitation of business with a government agency over
competing software solution companies exists here.

352.    Defendants furthermore violated Cal. Gov't Code § 12651 (a)(1), (2), (3), (4)) by:
(1) knowingly causing hundreds of thousands of false claims to be made, used, and presented to
the State of California; (2) causing false records or statements to get a false or fraudulent claim
paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent
claim allowed or paid; (4) discovering and knowing about the falsity of these claims but, failing
to disclose, and not notifying the State and returning the payments. It is also liable by virtue of its
systematic violation of Federal and state laws.

353.    By virtue of registering deals under the partner program and wrongfully inducing
the government to purchase Adobe licenses, a partner is paid unlawful kickbacks for doing
business with state and local government customers.

354.    The kickback scheme caused state and local government customers to pay for
claims submitted under its contract with Carahsoft, which carries Adobe products and services.
In addition, by offering illegal remuneration to its partners under the SPP, Adobe also caused the
creation and submission of false and fraudulent records, statements, and claims to the
government.

355.    The State of California was unaware of this fraud and could not have uncovered
the Defendants' scheme absent this disclosure by the Relators.

356.    Compliance with applicable Federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes, regulations and manuals was also an express condition of payment of claims submitted to the State of California.

357.    Had the State of California known that Defendants Adobe and Carahsoft were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

358.    As a result of Defendants' violations of Cal. Gov't Code § 12651 (a) and Cal. Bus. & Prof. Code § 650-650.1, the State of California has been damaged.

359.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to Cal. Gov't Code § 12652 (c) on behalf of themselves and the State of California.

360.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims and to merely assert separate damage to the State of California.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants.

**To the State of California:**

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;

(2) A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of California;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relators:**

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement of reasonable expenses which Relators incurred in connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

**COUNT 8**
**FLORIDA FALSE CLAIMS ACT**
**(Defendants Adobe and Carahsoft)**

361.     All paragraphs of this Amended Complaint are realleged and expressly adopted and incorporated as if fully set forth herein again.

362.     This is a *qui tam* action brought by Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq*.

363.     Fla. Stat. § 68.082(2) provides liability for any person who:

(a)     knowingly presents; or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c)     conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

364.     Adobe operates state and local deal registrations under the SPP in order to encourage partners to assist and influence the sale of Adobe software solutions to state and local government customers. Defendants violated Fla. Stat. § 456.054(2) by engaging in the kickback scheme and related conduct described in this Amended Complaint.

365.     As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

366.     Defendants furthermore violated Fla. Stat. § 68.082(2)(a),(b),(c) by: (1) knowingly causing hundreds of thousands of false claims to be made, used, and presented to the State of Florida; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; (4) discovering and knowing about the falsity of these claims but, failing to disclose, and not notifying the State and returning the payments. It is also liable by virtue of its systematic violation of Federal and state laws.

367.     By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

368.     The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its partners under the SPP, Adobe also caused the creation and submission of false and fraudulent records, statements, and claims to the government.

369.    The State of Florida was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relators.

370.    Compliance with applicable Federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendants' conduct. Compliance with applicable Florida statutes, regulations and manuals was also an express condition of payment of claims submitted to the State of Florida.

371.    Had the State of Florida known that Defendants Adobe and Carahsoft were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

372.    As a result of Defendants' violations of Fla. Stat. § 68.082(2) and Fla. Stat. § 456. 054(2), the State of Florida has been damaged.

373.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to Fla. Stat. § 68.083(2) on behalf of themselves and the State of Florida.

374.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims and to merely assert separate damage to the State of California.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants.

**To the State of Florida:**

(1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' conduct;

(2) A civil penalty of up to $5,000 and not more than $10,000 for each false claim which Defendants presented or caused to be presented to the State of Florida;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relators:**

(1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2) Reimbursement of reasonable expenses which Relators incurred in connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

### COUNT 9
### HAWAII FALSE CLAIMS ACT
### (Defendants Adobe and Carahsoft)

375.    All paragraphs of this Amended Complaint are realleged and expressly adopted

and incorporated as fully set forth herein again.

376.    This is a *qui tam* action brought by Relators on behalf of the State of Hawaii to

recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat.

661-21 *et seq*.

377.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

…

(7) Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim; or

(8) Conspires to commit any of the conduct described in the subsection.

378.     Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software solutions to state and local government customers.

379.     As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

380.     Defendants furthermore violated Haw. Rev. Stat. §661-21(a) by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State of Hawaii; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and failing to disclose the false claim to the State within a reasonable time after discovery of the false claim. It is also liable by virtue of its systematic violation of Federal and state laws.

381.     By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

382.     The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its partners under the SPP, Adobe also caused the

creation and submission of false and fraudulent records, statements, and claims to the government.

383. The State of Hawaii was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relators.

384. Compliance with applicable Federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes, regulations and manuals was also an express condition of payment of claims submitted to the State of Hawaii.

385. Had the State of Hawaii known that Defendants Adobe and Carahsoft were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

386. As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a), the State of Hawaii has been damaged.

387. Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of themselves and the State of Hawaii.

388. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the Federal claims and to merely assert separate damage to the State of Hawaii.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

**To the State of Hawaii:**

(1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' illegal conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Hawaii;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relators:**

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. §661-27 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

<u>**COUNT 10**</u>
**ILLINOIS WHISTLEBLOWER REWARD & PROTECTION ACT**
**(Defendants Adobe and Carahsoft)**

389.    All paragraphs of this Amended Complaint are realleged and expressly adopted and incorporated as fully set forth herein again.

390.    This is a *qui tam* action brought by Relators on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*

391.    740 ILCS 175/3(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an

110

officer or employee of the State or a member of the Guard a
false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used,
a false record or statement to get a false or fraudulent claim
paid or approved by the State;

(3) conspires to defraud the State by getting a false or
fraudulent claim allowed or paid.

392.    In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud

and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback,

bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for

furnishing any item or service for which payment may be made in whole or in part under this

Code.

393.    Adobe operates state and local deal registrations under the SPP in order to

encourage participants of the program to assist and influence the sale of Adobe software

solutions to state and local government customers.

394.    As is the case for federal deal registrations, clear and recognized intent and

financial motive by Adobe to affect the solicitation of business with a government agency over

competing software solution companies exists here.

395.    Defendants furthermore violated 740 ILCS 175/3(a)(1), (2), (3) by: (1) knowingly

causing hundreds of thousands of false claims to be made, used, and presented to the State of

Illinoi; (2) causing false records or statements to get a false or fraudulent claim paid or approved

by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or

paid; (4) discovering and knowing about the falsity of these claims but, failing to disclose, and

not notifying the State and returning the payments. It is also liable by virtue of its systematic

violation of Federal and state laws.

396.    By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

397.    The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its partners under the SPP, Adobe also caused the creation and submission of false and fraudulent records, statements, and claims to the government.

398.    The State of Illinois was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relators.

399.    Compliance with applicable Federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendants' conduct. Compliance with applicable Illinois statutes, regulations and manuals was also an express condition of payment of claims submitted to the State of Illinois.

400.    Had the State of Illinois known that Defendants Adobe and Carahsoft were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

401.    As a result of Defendants' violations of 740 ILCS 175/3(a) and 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks), the State of Illinois has been damaged.

402.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

403.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims and to merely assert separate damage to the State of Illinois.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

**To Relators**:

(1) The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

**To the State Of Illinois**:

(1) Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Illinois;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

### COUNT 11
### IOWA FALSE CLAIMS ACT
### (Defendants Adobe and Carahsoft)

404.     All paragraphs of this Amended Complaint are realleged and expressly adopted and incorporated as if fully set forth herein again.

405.     This is a *qui tam* action brought by Relators on behalf of the State of Iowa to recover treble damages and civil penalties under Iowa Code § 685.1 *et seq.*

406.     Iowa Code § 685.2 provides in part for liability for anyone who:

(a)  Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

(b)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(c)  Conspires to commit a violation of paragraphs [a, b, and g]
… or

(g)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

407.     Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software solutions to state and local government customers.

408.     As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

409.     Defendants furthermore violated Iowa law, including Iowa Code § 685.1 *et seq.* by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State of Iowa; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; and (3) conspiring to defraud the State by getting a false or fraudulent

claim allowed or paid. It is also liable by virtue of its systematic violation of Federal and state laws.

410.     By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

411.     The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its partners under the SPP, Adobe also caused the creation and submission of false and fraudulent records, statements, and claims to the government.

412.     The State of Iowa was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relators.

413.     Compliance with applicable Federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Iowa in connection with Defendants' conduct. Compliance with applicable Iowa statutes, regulations and manuals was also an express condition of payment of claims submitted to the State of Iowa.

414.     Had the State of Iowa known that Defendants Adobe and Carahsoft were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

415.    As a result of Defendants' violations of Iowa law, including Iowa Code § 685.1 *et seq.*, the State of Iowa has been damaged.

416.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to Iowa law, including Iowa Code § 685.1 *et seq.*, on behalf of themselves and the State of Iowa.

417.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the Federal claim and merely asserts separate damage to the State of Iowa.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

**To the State of Iowa**:

(1 ) Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Iowa;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relators:**

(1 ) The maximum amount allowed pursuant to Iowa Code § 685.1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) That Relators be awarded the maximum amount allowed as a Relators' Share under State law

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

**COUNT 12**

116

## MASSACHUSETTS FALSE CLAIMS ACT
### (Defendants Adobe and Carahsoft)

418.    All paragraphs of this Amended Complaint are realleged and expressly adopted and incorporated as fully set forth herein again.

419.    ALM GL ch. 12, § 5B provides liability, in part, for:

(a)  Any person who:

(1)  knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)  knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3)  conspires to commit a violation of this subsection;

…

(9)  knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof;

420.    In addition, ALM GL ch. 118E, § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any good, service or item for which payment may be made in whole or in part under this Code.

421.    Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software solutions to state and local government customers.

422.     As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

423.     Defendants violated ALM GL ch. 12, § 5B by: (1) conspiring to commit fraud; (2) knowingly causing hundreds of thousands of false claims to be made, used and presented to the Commonwealth of Massachusetts; (3) concealment and failure to report overpayment; and (4) its deliberate and systematic violation of Federal and state laws.

424.     By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

425.     The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its partners under the SPP, Adobe also caused the creation and submission of false and fraudulent records, statements, and claims to the government.

426.     The Commonwealth of Massachusetts was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relators.

427.     Compliance with applicable Federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct. Compliance with applicable Commonwealth of Massachusetts statutes, regulations and manuals was also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

428.    Had the Commonwealth of Massachusetts known that Defendants Adobe and Carahsoft were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

429.    As a result of Defendants' violations of Massachusetts laws cited herein, the Commonwealth of Massachusetts has been damaged.

430.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to ALM GL ch. 12, § 5 *et. seq.* on behalf of themselves and the Commonwealth of Massachusetts.

431.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims and to merely assert separate damage to the Commonwealth of Massachusetts.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants.

**To the Commonwealth of Massachusetts**:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Massachusetts;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relators:**

(1) The maximum amount allowed pursuant to ALM GL ch. 12, § 5F and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in

connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## COUNT 13
## MINNESOTA FALSE CLAIMS ACT
### (Defendants Adobe and Carahsoft)

432.     All paragraphs of this Amended Complaint are realleged and expressly adopted and incorporated as fully set forth herein again.

433.     This is a *qui tam* action brought by Relators on behalf of the State of Minnesota to recover treble damages and civil penalties under Minn. Stat. § 15C.01 *et seq.*

434.     Minn. Stat. § 15C.02 provides in part for liability for any person who:

(1) knowingly presents, or causes to be presented; to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

(3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim;

… or

(7) knowingly, makes or uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or a political subdivision.

435.     Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software solutions to state and local government customers.

436.     As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

437.     Defendants Adobe and Carahsoft furthermore violated Minnesota law, including *Minn. Stat.* § 15C.01 *et seq.,* by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State of Minnesota; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and (4) concealing the fraud. It is also liable by virtue of its systematic violation of Federal and state laws.

438.     By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

439.     The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its partners under the SPP, Adobe also caused the creation and submission of false and fraudulent records, statements, and claims to the government.

440.     Had the State of Minnesota known that Defendants Adobe and Carahsoft were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software

programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

441.    As a result of Defendants' violations of Minnesota law, the State has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

442.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to Minn. Stat. § 15C.01 *et seq.* on behalf of themselves and the State of Minnesota.

443.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the Federal claims and to merely assert separate damage to the State of Minnesota.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

**To the State of Minnesota:**

(1) Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relators:**

(1) The maximum amount allowed pursuant to Minn. Stat. § 15C.01 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## COUNT 14
### NEW JERSEY FALSE CLAIMS ACT
### (Defendants Adobe and Carahsoft)

444.     All paragraphs of this Amended Complaint are realleged and expressly adopted

and incorporated as fully set forth herein again.

445.     This is a *qui tam* action brought by Relators on behalf of the State of New Jersey

to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. §

2A:32C-1 *et seq*.

446.     N.J. Stat. § 2A:32C-3 provides, in part, liability for any person who:

    a.   Knowingly presents or causes to be presented to an employee, officer or agent
of the State, or to any contractor, grantee, or other recipient of State funds, a
false or fraudulent claim for payment or approval;

    b.   Knowingly makes, uses, or causes to be made or used a false record or
statement to get a false or fraudulent claim paid or approved by the State:

    c.   Conspires to defraud the State by getting a false or fraudulent claim allowed
or paid by the State;

    … or

    g.   Knowingly makes, uses, or causes to be made or used a false record or
statement to conceal, avoid, or decrease an obligation to pay or transmit
money or property to the State.

447.     In addition, New Jersey makes the payment or receipt of bribes or kickbacks

unlawful as follows:

    (c)   Any provider, or any person, firm, partnership, corporation or entity who
solicits, offers, or receives any kickback, rebate or bribe in connection with:

        (1)   The furnishing of items or services for which payment is or may be made
in whole or in part under this act; or
        (2)   The furnishing of items or services whose cost is or may be reported in
whole or in part in order to obtain benefits or payments under this act; or

123

N.J.Stat. § 30:4D-17.

448.    Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software solutions to state and local government customers. Defendants violated N.J.Stat. § 30:4D-17 by engaging in the kickback scheme and related conduct described in this Amended Complaint.

449.    As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

450.    Defendants furthermore violated New Jersey law, including N.J. Stat. § 2A:32C-1 *et seq.* by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State of New Jersey; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and (4) concealing the fraud. It is also liable by virtue of it systematic violation of Federal and state laws.

451.    By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

452.    The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its business level partners under the SPP, Adobe also caused the creation and submission of false and fraudulent records, statements, and claims to the government.

124

453.    The State of New Jersey was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relator.

454.    Compliance with applicable Federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendants' conduct. Compliance with applicable New Jersey statutes, regulations and manuals was also an express condition of payment of claims submitted to the State of New Jersey.

455.    Had the State of New Jersey known that Defendants Adobe and Carahsoft were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

456.    As a result of Defendants' violations of New Jersey law, the State has been damaged.

457.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to N.J. Stat. § 2A:32C-1 *et seq.* on behalf of themselves and the State of New Jersey.

458.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the Federal claims and to merely assert separate damage to the State of New Jersey.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

**To the State of New Jersey:**

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of New Jersey;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relators:**

(1 ) The maximum amount allowed pursuant to N.J. Stat. § 2A:32C-1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## COUNT 15
## NEW YORK FALSE CLAIMS ACT
### (Defendants Adobe and Carahsoft)

459.    All paragraphs of this Amended Complaint are realleged and expressly adopted and incorporated as fully set forth herein again.

460.    This is a *qui tam* action brought by Relators on behalf of the State of New York to recover treble damages and civil penalties under the New York False Claims Act, NY CLS St Fin § 187 *et seq*. Section 189 provides, in part, liability for any person who:

(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c) conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision;

126

461.     Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software solutions to state and local government customers.

462.     As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

463.     Defendants Adobe and Carahsoft furthermore violated NY CLS St Fin § 187 *et seq.* by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State of New York; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; and (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid. It is also liable by virtue of its systematic violation of Federal and state laws.

464.     By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

465.     The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its partners under the SPP, Adobe also caused the creation and submission of false and fraudulent records, statements, and claims to the government.

466.     The State of New York was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relators.

467.    Compliance with applicable Federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Defendants' conduct. Compliance with applicable New York statutes, regulations and manuals was also an express condition of payment of claims submitted to the State of New York.

468.    Had the State of New York known that Defendants Adobe and Carahsoft were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

469.    As a result of Defendants' violations NY CLS St Fin § 187 *et seq.*, the State of New York has been damaged.

470.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to NY CLS St Fin § 187 *et seq.* on behalf of themselves and the State of New York.

471.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the Federal claims and to merely assert separate damage to the State of New York.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

**To the State of New York:**

(1) Three times the amount of actual damages which the State of New York has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New York;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relators:**

(1 ) The maximum amount allowed pursuant to NY CLS St Fin § 187 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

**COUNT 16**
**TENNESSEE FALSE CLAIMS ACT**
**(Defendants Adobe and Carahsoft)**

472.     All paragraphs of the Amended Complaint are realleged and expressly adopted and incorporated as if fully set forth herein again. This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee False Claims Act, § 4-18-103 *et seq.*

473.     The Tennessee False Claims Act, § 4-18-103 provides liability in part for any person who:

(1)     Knowingly presents or causes to be presented to an officer or employee of the state or any political subdivision thereof, a false claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the State or by any political subdivision;

(3)     Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;
…

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision;

474.     Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software solutions to state and local government customers.

475.     As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

476.     Defendants Adobe and Carahsoft furthermore violated Tennessee False Claims Act, § 4-18-103 by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State of Tennessee; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and (4) concealment and non-disclosure of the overpayments and fraud. It is also liable by virtue of it systematic violation of Federal and state laws.

477.     By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

478.     The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its business level partners under the SPP, Adobe also caused the creation and submission of false and fraudulent records, statements, and claims to the government.

479.     The State of Tennessee was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relators.

480.     Compliance with applicable Federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendants' conduct. Compliance with applicable Tennessee statutes, regulations and manuals was also an express condition of payment of claims submitted to the State of Tennessee.

481.     Had the State of Tennessee known that Defendants Adobe and Carahsoft were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

482.     As a result of Defendants' violations of Tennessee False Claims Act, § 4-18-103 *et seq.*, the State of Tennessee has been damaged.

483.     Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to Tennessee False Claims Act, § 4-18-103 on behalf of themselves and the State of Tennessee.

484.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the Federal claims and to merely assert separate damage to the State of Tennessee.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

**To the State of Tennessee:**

(1) Three times the amount of damages which the State of Tennessee has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $2,500 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Tennessee;

(3) Prejudgment interest; and

(4) All cost incurred in bringing this action.

**To Relators:**

(1) The maximum amount allowed pursuant to § 4-18-103 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## COUNT 17
### COMMONWEALTH OF VIRGINIA
### (Defendants Adobe and Carahsoft)

485.   All paragraphs of this Amended Complaint are realleged and expressly adopted and incorporated as if fully set forth herein again.

486.   This is a *qui tam* action brought by Relators on behalf of the Commonwealth of Virginia for treble damages and penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 *et seq*. Section 8.01-216.3 provides liability for any person who:

1.   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

2.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

3.      Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7;

...

7.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth;

487.    Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software solutions to state and local government customers.

488.    As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

489.    Defendants Adobe and Carahsoft furthermore violated Virginia Fraud Against TaxPayers Act §8.01-216.1 *et seq.* by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State of Virginia; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; and (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid. It is also liable by virtue of its systematic violation of Federal and state laws.

490.    By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

491.    The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its partners under the SPP, Adobe also caused the

creation and submission of false and fraudulent records, statements, and claims to the government.

492.    The Commonwealth of Virginia was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relators.

493.    Compliance with applicable Federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' conduct. Compliance with applicable Virginia statutes, regulations and manuals was also an express condition of payment of claims submitted to Virginia.

494.    Had the Commonwealth of Virginia known that Defendants Adobe and Carahsot were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

495.    As a result of Defendants' violations of the Virginia Fraud Against Tax Payers Act, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

496.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to Virginia Fraud Against Taxpayers Act on behalf of themselves and the Commonwealth of Virginia.

497.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the Federal claims and to merely assert separate damage to the Commonwealth of Virginia.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

**To Relators**:

(1) The maximum amount allowed pursuant to Va. Code Ann. § 32.1-315, § 8.01-216.1 *et seq.*, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

**To the Commonwealth of Virginia**:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

<u>**COUNT 18**</u>
**CHICAGO FALSE CLAIMS ACT**
**(Defendants Adobe and Carahsoft)**

498.    All paragraphs of the Amended Complaint are realleged and expressly adopted and incorporated as if fully set forth herein again. This is a *qui tam* action brought by Relator on behalf of the city of Chicago to recover treble damages and civil penalties under the Chicago False Claims Act, § 1-22-030.

499.    The Chicago False Claims Act, § 1-22-030, provides liability in part for any person who:

(1) Knowingly presents, or causes to be presented, to an official or employee of the city a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the city;

(3) Conspires to defraud the city by getting a false or fraudulent claim allowed or paid; ...

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the city, is liable to the city for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages which the city sustains because of the act of that person. A person violating this section shall also be liable to the city for the attorney's fees and costs of a civil action brought to recover any such penalty or damages.

§ 1-22-030

500.     Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software solutions to state and local government customers.

501.     As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

502.     Defendants Adobe and Carahsoft furthermore violated the Chicago False Claims Act, § 1-22-030 by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the municipality of Chicago; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the municipality; (3) conspiring to defraud the municipality by getting a false or fraudulent claim allowed or paid; and (4) concealment and non-disclosure of the overpayments and fraud. It is also liable by virtue of it systematic violation of Federal and state laws.

503.     By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

504.    The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its business level partners under the SPP, Adobe also caused the creation and submission of false and fraudulent records, statements, and claims to the government.

505.    The city of Chicago was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relators.

506.    Compliance with applicable Federal, state, and local laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the city of Chicago in connection with Defendants' conduct. Compliance with applicable municipality statutes, regulations and manuals was also an express condition of payment of claims submitted to the city of Chicago.

507.    Had the city of Chicago known that Defendants Adobe and Carahsoft were violating the Federal, state, and local laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

508.    As a result of Defendants' violations of the Chicago False Claims Act, § 1-22-030 *et seq.*, the city of Chicago has been damaged.

509.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to the Chicago False Claims Act, § 1-22-030 on behalf of themselves and the city of Chicago.

510.     This Court is requested to accept pendant jurisdiction of this related municipality

claim as it is predicated upon the exact same facts as the Federal and state claims and to merely

assert separate damage to the city of Chicago.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

**To the city of Chicago:**

(1) Three times the amount of damages which the city of Chicago has sustained as a
result of Defendant's conduct;

(2)  A civil penalty of not less than $5,000 and not more than $10,000 for each false
claim which Defendants caused to be presented to the city of Chicago;

(3) Prejudgment interest; and

(4) All cost incurred in bringing this action.

**To Relators:**

(1) The maximum amount allowed pursuant to the Chicago False Claims Act, § 1-22-030
and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with
this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under
municipal law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## <u>COUNT 19</u>
## NEW YORK CITY FALSE CLAIMS ACT
### (Defendants Adobe and Carahsoft)

511.     All paragraphs of the Amended Complaint are realleged and expressly adopted

and incorporated as if fully set forth herein again. This is a *qui tam* action brought by Relator on

behalf of New York City to recover treble damages and civil penalties under the New York City

False Claims Act, §§ 7-801-7-810.

512.    The New York City False Claims Act, §§ 7-801-7-810, provides liability in part

for any person who:

(1) Knowingly presents, or causes to be presented, to any city official or employee, a false claim for payment or approval by the city;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the city;

(3) Conspires to defraud the city by getting a false claim allowed or paid by the city;

...

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease, directly or indirectly, an obligation to pay or transmit money or property to the city;

Shall be liable to the city for three times the amount of damages which the city sustains because of the act or acts of such person, and a civil penalty of between five thousand and fifteen thousand dollars for each violation of this section, except that any party to a civil enforcement action commenced may request the court to assess, and the court may agree to so assess, not more than two times the amount of damages sustained because of the act or acts of such person if all of the following circumstances are found:

(i)     The person committing the violation of section 7-803 of this chapter had furnished all information known to such person about such act or acts to (a) the commissioner of investigation or (b) the corporation counsel or a city agency hear, who shall refer such information to the commissioner of investigation, and has furnished such information within thirty days of the date on which such person first obtained the information;

(ii)    Such person fully cooperated with any government investigation of such violation; and

(iii)   At the time such person furnished information about the violation, no criminal or civil action or proceeding, or administrative action had commenced with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation.

b. A person who violates this section shall also be liable for the costs, expenses, and attorneys' fees of a civil enforcement action and for the cost of the city's investigation.

§ 7-803

513.     Adobe operates state and local deal registrations under the SPP in order to encourage participants of the program to assist and influence the sale of Adobe software solutions to state and local government customers.

514.     As is the case for federal deal registrations, clear and recognized intent and financial motive by Adobe to affect the solicitation of business with a government agency over competing software solution companies exists here.

515.     Defendants Adobe and Carahsoft furthermore violated the New York City False Claims Act, §§ 7-801-7-810 by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the municipality of New York; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the municipality; (3) conspiring to defraud the municipality by getting a false or fraudulent claim allowed or paid; and (4) concealment and non-disclosure of the overpayments and fraud. It is also liable by virtue of it systematic violation of Federal and state laws.

516.     By virtue of registering deals under the partner program and wrongfully inducing the government to purchase Adobe licenses, a partner is paid an unlawful kickback for doing business with state and local government customers.

517.     The kickback scheme caused state and local government customers to pay for claims submitted under its contract with Carahsoft, which carries Adobe products and services. In addition, by offering illegal remuneration to its business level partners under the SPP, Adobe also caused the creation and submission of false and fraudulent records, statements, and claims to the government.

518.     The city of New York was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relators.

519.    Compliance with applicable Federal, state, and local laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the city of New York in connection with Defendants' conduct. Compliance with applicable municipality statutes, regulations and manuals was also an express condition of payment of claims submitted to the city of New York.

520.    Had the city of New York known that Defendants Adobe and Carahsoft were violating the Federal, state, and local laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the billing criteria of the government-funded software programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants.

521.    As a result of Defendants' violations of the New York City False Claims Act §§ 7-801-7-810 *et seq.*, the city of New York has been damaged.

522.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who bring this action pursuant to the New York City False Claims Act §§ 7-801-7-810 *et seq.*, on behalf of themselves and the city of New York.

523.    This Court is requested to accept pendant jurisdiction of this related municipality claim as it is predicated upon the exact same facts as the Federal and state claims and to merely assert separate damage to the city of New York.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

**To the city of New York:**

(1) Three times the amount of damages which the city of New York has sustained as a result of Defendant's conduct;

(2)  A civil penalty of not less than $5,000 and not more than $15,000 for each false claim which Defendants caused to be presented to the city of New York;

(3) Prejudgment interest; and

(4) All cost incurred in bringing this action.

**To Relators:**

(1) The maximum amount allowed pursuant to the New York City False Claims Act §§ 7-801-7-810 *et seq.*, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) That Relators are awarded the maximum amount allowed as the Relators' Share under municipal law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Relators hereby demand trial by jury.

**Dated:** December 13, 2018

Respectfully submitted,

Jay P. Holland (Fed Bar No. 06015)
jholland@jgllaw.com
Joseph Greenwald & Laake, P.A
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
Tel: (301) 220-2200

142

Jon D. Pels
jpels@pelslaw.com
4845 Rugby Avenue, Third Floor
Bethesda, MD 20814
Tel: (301) 986-5570

*(pro hac vice admission)*

*Attorneys for Relators Alan Dowless,*
*Barbara Evans, and Carrie Whalen*

CONSENT MOTION OF THE UNITED STATES TO LIFT THE
SEAL IN THIS ACTION AND TO SUBSTITUTE THE RELATORS'
COMPLAINT AND AMENDED COMPLAINT ON THE DOCKET
WITH VERSIONS THAT REDACT PERSONAL IDENTIFIABLE INFORMATION

# EXHIBIT B